WR-62,593-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/18/2015 3:30:24 PM
Accepted 8/18/2015 4:03:03 PM
ABEL ACOSTA
CLERK

NO. 62,593
Trial Cause No. 762351

| | | |
|---|---|---|
| EX PARTE | § | IN THE TEXAS COURT OF |
| | § | |
| | § | |
| BERNARDO ADAN TERCERO | § | CRIMINAL APPEALS |

RECEIVED
COURT OF CRIMINAL APPEALS
8/18/2015
ABEL ACOSTA, CLERK

## SUGGESTION FOR THIS COURT TO RECONSIDER ON ITS OWN MOTION MR. TERCERO'S SECOND APPLICATION FOR HABEAS CORPUS, NO. 62,593-02 AND MOTION FOR STAY OF EXECUTION

*MR. TERCERO HAS AN IMMINENT EXECUTION DATE SCHEDULED ON AUGUST 26, 2015*

WALTER C. LONG
Texas Bar No. 24002491
Attorney-at-Law
P.O. Box 41557
Austin, Texas 78701
512-912-0722 (office phone)
512-912-0722 (fax)
waltlong@aol.com

**NO. 62,593**
**Trial Cause No. 762351**

| | | |
|---|---|---|
| EX PARTE | § | IN THE TEXAS COURT OF |
| | § | |
| | § | |
| BERNARDO ADAN TERCERO | § | CRIMINAL APPEALS |

**SUGGESTION FOR THIS COURT TO RECONSIDER ON ITS
OWN MOTION MR. TERCERO'S SECOND APPLICATION
FOR HABEAS CORPUS, NO. 62,593-02
AND ACCOMPANYING
<u>MOTION FOR STAY OF EXECUTION</u>**

TO THE HONORABLE JUDGES OF THE TEXAS COURT OF CRIMINAL
APPEALS**:**

COMES NOW Movant, BERNARDO TERCERO, by and through his pro-

bono counsel, Walter C. Long, and pursuant to the provisions of Article 11.071,

Vernon's Ann. C.C.P., and Texas Rule of Appellate Procedure 79.2 (d),[1] presents

this his Suggestion for this Court to Reconsider on its Own Motion Mr. Tercero's

---

[1] Under Tex. R. App. Proc. 79.2(d), this Court, on its own motion, may reexamine the disposition of an application for writ of habeas corpus filed pursuant to Article 11.071. *Ex parte Moreno*, 245 S.W.3d 419, 420 (Tex. Crim. App. 2008) (electing to reconsider the applicant's previously rejected *Penry* claim). In appropriate circumstances, the Court has regularly exercised this power. *See Moreno*, 245 S.W.3d at 420; *see also*, *e.g.*, *Ex parte Thomas*, No. WR-16,556 (Tex. Crim. App. June 9, 2010) (not designated for publication) (agreeing, on the Court's own motion, to reconsider March 2010 decision denying relief under *Penry*); *Ex parte Hathorn*, No. AP-75,917 (Tex. Crim. App. May 14, 2008) (not designated for publication) (agreeing, on the Court's own motion, to reconsider September 2006 decision denying relief under *Penry*); *see also*, *e.g.*, *Ex parte Hunter*, No. WR–69291–01 (Tex. Crim. App. April 25, 2012) (not designated for publication) (treating successive application for relief under Tex. Code Crim. Proc. art. 11.071 as suggestion that the Court reconsider its previous denial of relief on Hunter's claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), and ordering further proceedings); *Ex parte Wesbrook*, No. WR–52120–02 (Tex. Crim. App. April 4, 2012) (not designated for publication) (same).

Second Application for Habeas Corpus, No. 62,593-02, and Accompanying Motion for Stay of Execution, and as grounds therefore, would respectfully show this Honorable Court the following:

## I.

## ILLEGAL CONFINEMENT AND RESTRAINT

Mr. Tercero is currently being illegally confined and restrained of his liberty by the State of Texas on Death Row in the Polunsky Unit of the Texas Department of Criminal Justice, Institutional Division, in Livingston, Texas. *See* Article 11.14, Texas Code of Criminal Procedure. Copies of the judgment and sentence in this case are attached as **Exhibit 1**. *Mr. Tercero is scheduled to be executed on Wednesday, August 26, 2015, at 6:00 p.m. Central time*.

## II.

## INTRODUCTION

Applicant BERNARDO TERCERO respectfully suggests that this Court should reconsider on its own motion Mr. Tercero's pro se application for habeas corpus and, in particular, the claim within it that trial counsel provided ineffective assistance of counsel by failing to meaningfully pursue mitigation investigation, and/or provide other appropriate and necessary relief in the interests of justice.

1. This Court should find that Richard Wheelan's performance as appointed counsel representing Mr. Tercero under Article 11.071, Texas Code of Criminal Procedure, did not meet the minimal statutory requirements of representation[2] required by Section 3(a),[3] because he did not investigate "the factual and legal grounds for the filing of an application for a writ of habeas corpus," and filed an application on May 22, 2002, No. 62,593-01, with no reasonable habeas claims. Thus, it could be reasonably found that the *pro se* application filed by Mr. Tercero on November 29, 2004, was Mr. Tercero's first application under Article 11.071. This Court should find that Mr. Wheelan's failure to meet the requirements of Section 3(a) should have estopped its own finding that Mr. Tercero himself failed to meet the requirements of Section 5 in his *pro se* pleading.

2. This Court should find that, even under *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), Mr. Wheelan did not provide Mr. Tercero with statutorily competent counsel within the meaning of art. 11.071, § 2(a).

3. Or, this Court should utilize the narrow factual scenario of Applicant's case to consider modifying *Graves* to allow restoration of ineffective assistance of trial counsel claims otherwise defaulted by ineffective state habeas counsel in the

---

[2] The minimal statutory requirements of representation were completely overlooked by this Court in *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002). *Graves* only provides an interpretation of "competent counsel" in Section 2(a), Article 11.071 (2000) and does not address nor supersede the Section 3 statutory requirements.

[3] Sec. 3(a) requires: "On appointment, counsel shall investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus."

same way that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), allow such claims in federal court. This Court should reopen Mr. Tercero's *pro se* application to authorize review of his ineffective assistance of trial counsel at punishment claim therein, allowing a full and fair opportunity to litigate that IAC claim as though presented in the initial state habeas application. The Court should hold that where habeas counsel's deficient performance has forfeited a substantial claim of ineffective assistance of trial counsel, a subsequent habeas application raising that claim will lie under art. 11.071, § 5.

## III.

## PROCEDURAL HISTORY

### 1. Initial State Court Proceedings

Mr. Tercero was convicted of capital murder and received a sentence of death on October 20, 2000, in the 232nd Judicial District Court of Harris County, Texas. A motion for new trial alleging State misconduct was denied following a hearing on December 18, 2000.

The judgment was affirmed on direct appeal in an unpublished opinion by this Court on September 18, 2002. *Tercero v. State*, No. 73,992 (Tex. Crim. App.

5

2002). Tercero's direct appeal counsel, Sid Crowley, did not file a petition for writ of certiorari in the United States Supreme Court.

Mr. Dick Wheelan (now deceased) filed an initial state habeas application in the trial court on May 22, 2002, in which he raised five record-based[4] claims:

1. The trial court violated Applicant's due process rights under the Fourteenth Amendment to the United States Constitution by admitting irrelevant and prejudicial victim impact and victim worth evidence at the penalty phase of the trial.

2. The trial court violated Applicant's rights under the Eighth and Fourteenth Amendments to the United States Constitution by admitting irrelevant and prejudicial victim impact and victim character evidence at the guilt-innocence phase of the trial.

3. Applicant's right to due process under the Fourteenth Amendment to the Constitution of the United States was violated in that the fact used to increase the maximum penalty for his crime was not charged in the indictment.

4. Trial counsel was constitutionally ineffective under the Sixth and Fourteenth Amendments to the United States Constitution by failing to object on due process grounds to irrelevant, excessive and prejudicial victim impact and victim character evidence during the penalty phase of the trial.

5. The "12-10" Rule of Article 37.071, V.A.C.C.P., which requires at least ten "no" votes for the jury to return a negative answer to the first or second special issue and at least ten "yes" votes for the jury to return an affirmative answer to the third special issue, violates the Eighth Amendment of the United States Constitution.

---

[4] Claims 1-3 and 5 are of the type that must be raised on direct appeal and, absent an allegation of ineffective assistance of trial or direct appeal counsel, are not cognizable in habeas corpus. Claim 4, although theoretically appropriate for habeas corpus, needed no factual development beyond the record.

Petition for Post-Conviction Relief to Vacate Judgment and Sentence, Writ of Habeas Corpus by a Person in State Custody, Application for Stay of Execution and Evidentiary Hearing, *Ex parte Bernardo Adan Tercero*, No. 762351-A, 232nd District Court, Harris County. State Habeas Record [Court of Criminal Appeals clerk's electronic copy; subsequently "SHR"] 000002.

The State answered Mr. Wheelan's application on July 11, 2002. Respondent's Original Answer, SHR 000077. The State observed to the trial court, "Applicant raises questions of law and fact that can be resolved by the Court of Criminal Appeals upon review of official court records and without need for an evidentiary hearing." Original Answer at 14, 31; SHR 000090, 000107. However, the State also asked the trial court to order trial counsel to provide an affidavit in response to Mr. Wheelan's fourth claim. Original Answer at 22, 31; SHR 000098, 000107. The court ordered an affidavit and, on March 26, 2004, Mr. Gilbert Villarreal, lead trial counsel, filed the affidavit. SHR 000116.

On November 29, 2004, Mr. Tercero filed a pro se motion. Applicant's Motion to Amend Petition for States Habeas Corpus [sic], No. 762351-A, *Ex parte Bernardo Adan Tercero*, 232nd District Court, Harris County (**Exhibit 2**).[5] In the

---

[5] This is the document found by this Court to be a successor habeas petition, No. 62,593-02, barred as an abuse of the writ under Section 5, Article 11.071.

motion, which was drafted by others,[6] Mr. Tercero asked this trial court to "order full discovery to develop matters that are not <u>adequately</u> developed in the existing record." Page 2 of motion; Bate stamp 000068 in State habeas record. He stated that those "matters" included what constituted, in sum, 1) *Brady* evidence; 2) trial counsel effectiveness; 3) appellate and state habeas counsel effectiveness; 4) and, notably, "to allow Applicant a professional investigation into all these unresolved issues, through instructive court order and to allow a reasonable period of time in which to amend this application after the investigation has been performed." Page 3; 000069. Mr. Tercero's pro se petition then alleged several "claims": 1) essentially a claim that trial counsel were ineffective for failing to investigate a Vienna Convention; 2) a claim that the State presented false testimony by Adalia Lima and committed misconduct with her (the claim that was the subject of the motion for new trial); 3) a claim that the State had withheld evidence that Ms. Lima saw the conflict between Mr. Tercero and the victim and that the victim had shot himself by accident; 4) ineffective assistance of trial counsel for failure to conduct meaningful mitigation investigation;[7] and 5) ineffectiveness of trial

---

[6] See Declaration of Bill Coble. **Exhibit 3.**

[7] Claim 4 arguably made sufficient factual allegations: "Applicant states that trial counsel questioning was very superficial and did nothing to establish any mitigating evidence to have the jury assess life rather than a death sentence." Page 6, 000073.

counsel for failure to call Sylvia Cotera to give favorable testimony on behalf of Mr. Tercero.[8]

On December 1, 2004, the State filed proposed findings and conclusions of law. On December 13, 2004, Mr. Wheelan filed proposed findings and conclusions. SHR 000124.

On June 2, 2005, Mr. Tercero filed a motion requesting the court to replace Mr. Wheelan. Motion for the Appointment of New 11.071 State Habeas Counsel. SHR 000132. In that motion, Mr. Tercero (or an inmate who assisted him) wrote, "I am concerned about the quality of the appointed State Habeas Counsel appointed to represent me in this court, and because I am aware that I may not be able to obtain Habeas relief on the basis of ineffective assistance of State Habeas Counsel during the federal proceedings." Motion at 1; SHR 000133 (emphasis in original). "To this point, the fact is that State appointed Habeas Counsel, Mr. Wheelan, has not been functioning as "Counsel", . . . Mr. Wheela[n]'s conduct is evasive and is detrimental to this applicant's case. . . . Mr. Wheelan has denied,

_____

[8] Cotera, in fact, was called by the State and provided testimony damaging to Mr. Tercero. *See infra* summary of facts. Strikingly, in trial counsel's file there is a report by the trial investigator, Rudy Vargas, about an interview he held with Ms. Cotera on the night before the Motion for New Trial hearing in this case. In that interview, Ms. Cotera alleged that major State misconduct had occurred in the securing and presentation of her testimony against Mr. Tercero, *see* **Exhibit 4** (Supplemental Report #2, R.J. Vargas, December 18, 2000). She alleged that her testimony, which very reasonably affected Mr. Tercero's conviction sentence, was false. Undersigned is not raising a claim here, but wishes the Court and the Harris County District Attorney's Office to know of Ms. Cotera's statement, because it is very concerning. Undersigned counsel plans to continue to investigate the issue. Up to now, attempts to locate Ms. Cotera have been unavailing. It is unknown, as well, why after sharing such material with the trial investigator, she did not appear at the Motion for New Trial hearing, which was conducted by direct appeal (not trial) counsel. Mr. Vargas has been contacted by an agent of the undersigned, and has stated he has no independent memory of this.

and refused to the applicant the oppertunity [sic] to even raise issues concerning Constitutional violations." Motion at 4; SHR 000134. Mr. Tercero concluded, "Based on my conversations, and experience with Mr. Wheelan (Also conversations with other clients he represents), I do not believe that State Appointed Habeas Counsel, Mr. Wheelan possesses the requisite background, knowledge, or experience which would enable him to properly represent me with due consideration to the seriousness of the possible penalty, and the unique nature of the litigation." Motion at 5; SHR 000135. Mr. Tercero prayed that the court would appoint new counsel or "at the very least appoint a competent CO-counsel." *Id* (emphasis in original). The trial court denied the motion on June 7, 2005. SHR 000130.

On June 10, 2005, the trial court explicitly adopted the State's proposed findings and conclusions of law and recommended that habeas relief be denied. Order, SHR 000153.

On November 16, 2005, this Court denied Mr. Wheelan's application and found that Mr. Tercero's pro se Motion (with claims) constituted a subsequent application barred under Section 5, Article 11.071, and dismissed the five claims within it as an abuse of the writ. Order, November 16, 2005 (per curiam). This is the "application" that Mr. Tercero now wishes to have this Court reconsider.

**2. Federal Court Proceedings**

On October 24, 2006, Mr. Tercero filed a pro se federal habeas petition in the federal district court in Houston, Texas. In the pro se petition, Tercero carried forward the issues he had presented in his "Motion" before this Court, dismissed as an abuse of the writ: trial counsel ineffectiveness in regard to Vienna Convention rights, false testimony of Idalia Lima, suppressed evidence regarding Lima, and trail counsel ineffective assistance for failing to engage in a meaningful investigation of mitigating evidence. On November 10, 2006, Mr. Don Vernay, court-appointed federal habeas counsel, filed an amended federal petition. *Tercero v. Quarterman*, No. 4:06-cv-3384 (S.D. Tex. – Houston). The amended petition included the claims that had been presented in No. 62,593-02, along with a new claim that Tercero was ineligible for the death penalty under *Roper v. Simmons*, 53 U.S. 551 (2005), and claims that state habeas counsel had provided constitutionally deficient performance and that this Court had "failed to safeguard Tercero's statutory right to "competent counsel" on state habeas review." The case proceeded tumultuously through the federal district court, where Mr. Tercero made unsuccessful attempts to fire his federally appointed counsel, Don Vernay, and filed a number of pro se documents.

The Texas Attorney General answered on June 22, 2007, that Mr. Tercero had not presented any of his claims in a procedurally correct manner: he had defaulted in state court the claims arising from No. 62,593-02, and had not exhausted the remainder. The federal district court stayed the federal proceedings so Mr. Tercero could return to the state courts to present his unexhausted claims, particularly the *Simmons* claim. This Court denied relief on the *Simmons* claim on March 3, 2010. *Ex parte Tercero*, WR-62,593-03 (Tex. Crim. App. Mar. 3, 2010) (unpublished). The parties returned to the federal district court, where the *Simmons* claim was litigated further. On February 7, 2013, the district court issued an order denying relief and Certificate of Appealability, stating, [t]he application of the AEDPA in this case is clear and conclusively bars relief." Memorandum and Order, Case 4:06-cv-03384 (S.D. Tex.—Houston Feb. 7, 2013), at 31. Specifically, the Court found:

> Tercero raised claims two and three, as well as part of claim one,[9] in his *pro se* state habeas application. The Court of Criminal Appeals dismissed Tercero's *pro se* application as an abuse of the writ. . . . Tercero's failure to present his claims to the state courts in a procedurally adequate manner bars federal courts from considering the merits.

Memorandum and Order at 9. The district court recognized that the U.S. Supreme Court recently had held that a deficient performance by a state habeas attorney

---

[9] The amended federal petition continued as a part of Claim 1 the claim that trial counsel had been ineffective for failing to conduct a proper mitigation investigation.

12

could amount to "cause" forgiving a federal procedural bar when inmates can only raise *Strickland* claims on state habeas review. *Id*. at 10 (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). However, the court noted that the Fifth Circuit had held that *Martinez* had no application to Texas cases. *Id*. at 11 (citing *Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012)). The court noted that the Supreme Court had recently granted certiorari review in *Trevino v. Thaler*, which "will decide whether *Martinez* applies to Texas." *Id*. Meanwhile, it stated, Fifth Circuit precedent "remains binding until the Supreme Court provides contrary guidance." *Id*.

The federal district court observed that "Tercero complains that his state habeas attorney is responsible for defaulting all the claims procedurally unavailable on federal review." *Id*. However, the court found that, "[o]f the eight claims that Tercero faults counsel for not raising, only two relate to trial counsel's representation." *Id*. One of those was the ineffective assistance of trial counsel claim for failure to engage in a proper mitigation investigation. The federal court found that, although Tercero had made the allegation, his pleadings did not "specify what investigation trial counsel ignored or how it would have impacted his defense. Tercero has not supported his allegations with affidavits or other admissible evidence that a reasonably effective attorney would have put before a

13

jury. Tercero has not produced his school or medical records, amassed unpresented material, or identified unpursued mitigation theories. He has not substantiated any previously unarticulated legal objections. Tercero has not proven that trial counsel provided defective representation, much less that habeas counsel should have raised the defaulted ineffective-assistance claims in his habeas application. . . . Tercero has not demonstrated cause to overcome the bar." *Id*. at13-14. The court also found that "Tercero's cursory arguments cannot prove actual prejudice." *Id*. In light of what is presented in this suggestion for reconsideration, appointed federal habeas counsel provided poor representation, as well. Had Mr. Vernay investigated the otherwise defaulted IAC-mitigation claim and presented the facts in support of the claim provided herein to the federal district court and the court had been motivated to wait for *Trevino*, it is quite possible that Mr. Tercero would not be in his current straits. However, the primary default was made by Richard Wheelan, who conducted no appropriate state habeas factual investigation whatsoever.

## IV.

## <u>INCOMPETENT STATE HABEAS REPRESENTATION</u>

Prior to the creation of the Office of Capital Writs, indigent state habeas petitioners in Texas faced a dangerous lottery in the appointment of attorneys to

14

represent them, as many of the attorneys assigned to cases were not competent.

When the Legislature enacted SB 1091 creating the Office of Capital Writs in

2009, the bill analysis described the problem as follows:

> Extensive studies, research by the Texas State Bar, and investigative news reports, have revealed pervasive flaws in the quality of legal representation for indigent defendants in the state habeas system. For example, a review of the state habeas cases decided between 1995 and 2002 revealed that one out of three death row inmates face execution without having their case properly investigated by a *competent* attorney.

Bill Analysis, http://tinyurl.com/loxh58n.

Richard Wheelan stood out from within the crew of the incompetent. The

Austin American-Statesman extensively studied 11.071 counsel appointments and

reported its findings in a series of articles in October 2006. To identify potentially

incompetent lawyers, the Statesman consulted a dozen leading habeas

practitioners:

> The American-Statesman's review of the state's death penalty writ system began by identifying 12 leading lawyers within the state's small circle of habeas practitioners. Those attorneys, including law school professors and teachers of continuing legal education courses, were asked to identify lawyers whose habeas work, in their experience and opinion, fell below professional standards.
>
> Fifteen such lawyers were mentioned at least three times, and copies of their writs were obtained from the Austin based Court of Criminal Appeals or from other sources.

Chuck Lindell, *Sloppy Lawyers Failing Clients on Death Row*, Austin American-Statesman, October 29, 2006, at A1.  The Statesman found that

> lawyers appointed to handle appeals for death row inmates routinely bungle the job, submitting work that falls far below professional standards, frequently at taxpayer expense.  Some appeals are incomplete, incomprehensible or improperly argued. Others are duplicated, poorly, from previous appeals.

*Id.*  Richard Wheelan was cited as among the fifteen for having "submitted a number of writs copied largely verbatim from a death row inmate's direct appeal, even though such claims cannot be considered in a writ of habeas corpus." *Id.*  Mr. Don Vernay, who was representing Mr. Tercero in federal court and complaining to the federal court about Mr. Wheelan around the time of the *Statesman* article, is quoted:  "People aren't being executed; they're being murdered by their lawyers. . . . I've been doing this for 20 years. I'm no wet-behind-the-ears law school graduate, but I have never seen anything this bad." *Id.*

Mr. Wheelan's billing for state habeas representation of Mr. Tercero constitutes "reviewing and reading the record" and "writing the brief" with mention of one apparent client visit, some interactions with trial counsel, Mr. Gilbert Villarreal, and a brief interaction with an investigator to prepare and serve a subpoena. **Exhibit 5**.  The billing records confirm what is apparent on the surface

of Mr. Wheelan's filed application for Mr. Tercero: he did little to nothing that a competent habeas attorney is supposed to do.

**1. Article 11.071, Section 3, unambiguously requires state habeas counsel to conduct extra-record investigation.**

Article 11.071 § 1 establishes "the procedures for an application for a writ of habeas corpus" following imposition of a death sentence. Pursuant to the plain terms of the statute, appointed state habeas counsel ("habeas counsel"), before filing a prisoner's initial application, "*shall investigate expeditiously . . . the factual and legal grounds for the filing of an application*[.]" TEX. CODE CRIM. PROC. art. 11.071 § (3)(a) ("Section 3") (emphasis added). Once this investigation is complete, and the initial habeas application has been filed consistent with the other procedures delineated in the article, Section 5 essentially forecloses review of claims raised thereafter.

Section 3 unambiguously requires that habeas counsel must investigate the grounds for a habeas application before it is filed. TEX. CODE CRIM. PROC. art. 11.071 § (3)(a) (habeas counsel must "expeditiously" investigate, "before and after the appellate record is filed," the "factual and legal grounds" for filing a habeas application) (emphasis added). *See Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000) (art. 11.071 "requires" investigation).

17

The text is unambiguous, but certain "extratextual factors," including the statute's legislative history, further support the proposition that counsel is under an affirmative duty to investigate prior to filing an initial habeas application, and that the Legislature intended this duty to be an integral component of habeas corpus procedure in Texas.[10]

The legislation was designed to give habeas applicants one "well-represented" bite at the apple; one chance for the applicant to raise all habeas issues in his initial petition. *See Ex parte Graves*, 70 S.W.3d 103, 130 (Tex. Crim. App. 2002) (Johnson, J., dissenting) ("The idea is this: [y]ou're going to be able to fund counsel in these instances, and we are going to give you one very well-represented run at a habeas corpus proceeding.") (emphasis added) (quoting Statement of Rep. Pete Gallego, May 18, 1995). Asked whether Article 11.071's faster procedure could result in unjust executions, Representative Gallego, the author of 11.071, responded that habeas applicants would:

> [G]et lawyers from day one. They get fully-paid investigators. They get all of the investigation . . . [and] the point that I've been trying to make is that . . . *everyone . . . will have a fully-paid investigation into their claims of innocence, into their claims of procedural . . . wrongdoing [and] into any claim they can possibly raise . . . for the first time in our history, we'll actually investigate those claims*.

---

[10] This Court may consider certain "extratextual factors" in construing the Code of Criminal Procedure. *See Ex parte Torres*, 943 S.W.2d 469, 473 (Tex. Crim. App. 1997) (citing Texas Gov't Code § 311.023).

*Id*. at 18, lines 24-28, 31-32 (emphasis added).

This is particularly true for claims of ineffective assistance of counsel. The Supreme Court recently noted in *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012), that ineffectiveness claims require "investigative work and an understanding of trial strategy[,]" which makes them difficult for an applicant to raise unless he can rely on a court opinion or attorney work product. Moreover, applicants confined in prison are "in no position to develop the evidentiary basis for [such] a claim . . ., which often turns on evidence outside the trial record."[11] *Id*.

Section 3 therefore must be construed as requiring habeas counsel to conduct a diligent investigation into ineffectiveness claims prior to filing the initial habeas application. Otherwise, the entire purpose of the statute is thwarted. Indeed, as the legislative history reveals, the initial application is a prisoner's first, and only, opportunity to fully investigate an ineffectiveness claim. If habeas counsel fails to conduct a diligent investigation prior to filing an initial application, the applicant does not receive the one "well-represented" bite at the apple that the legislature intended.

An Article 11.071 proceeding provides the first meaningful opportunity to investigate trial counsel's performance, which is why this Court considers it the

---

[11] An applicant such as Mr. Tercero who files *pro se* pleadings in order to present cognizable claims, when his attorney is not, should not be treated as strictly as counsel in relation to the requirement to plead facts.

appropriate forum for raising such claims. *See, e.g.*, *Mata v. State*, 226 S.W.3d 425, 430 n.14 (Tex. Crim. App. 2007) ("As a general rule, one should not raise . . . ineffective assistance of counsel on direct appeal.") (emphasis in original) (citation omitted).[12] Thus, if habeas counsel is ineffective, "no state court at any level" will have the opportunity to review that applicant's ineffectiveness claim. *See* TEX. CODE CRIM. PROC. art. 11.071, § (5)(a); *see also Martinez*, 132 S. Ct. at 1316. Such a result would be patently at odds with the Legislature's manifest intent.

The contemporaneous State Bar of Texas practice manual is another "extratextual source" that confirms 11.071 counsel's duty to conduct a thorough investigation beyond the printed trial record. One year after article 11.071 was enacted, the State Bar of Texas published the third edition of its Texas Criminal Appellate Manual. One of its chapters was a primer for defense counsel litigating capital habeas cases. The State Bar Manual confirms that, by 1996, the prevailing standard of care in capital habeas representation required meaningful investigation.

The manual begins with "essential ideas to bear in mind" when considering the habeas corpus litigation; the first two stress the need to investigate:

---

[12] *Accord Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mitchell v. State*, 68 S.W.3d 640, 643 (Tex. Crim. App. 2002) (habeas corpus "is the appropriate vehicle [in Texas] to investigate ineffective-assistance claims"); *Mallet v. State*, 65 S.W.3d 59, 62-63 (Tex Crim. App. 2001); *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000) ("a post-conviction writ proceeding . . . is the preferred method for gathering the facts necessary to substantiate" an ineffectiveness claim); *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999); *Jackson v. State*, 973 S.W.2d 954, 957 (Tex Crim. App. 1998).

1. *State habeas litigation is not the same as a direct appeal. Habeas litigation concentrates on developing and presenting facts outside the appellate record* which, in conjunction with facts in the record, raise important constitutional claims. Habeas counsel must know the appellate record, but cannot be bound to it, or they will offer their clients nothing more than another attempt at a direct appeal.

2. *Writ practice requires investigation. You can't learn about, develop, and present facts outside the record if you don't investigate the case. Investigation for a writ can be as intensive as investigation in preparation for trial.* This must be so particularly where habeas counsel believes that trial counsel may have rendered ineffective assistance of counsel. *It is impossible to accurately evaluate the effectiveness of counsel without knowing what the counsel in question knew or could have known.*

*Id*. at 4 (emphasis added).

The State Bar manual repeatedly emphasizes the paramount importance of extra-record fact development and the use of trained investigators. *Id*. at 31.

The State Bar Manual describes three basic methods for investigating the case. First, habeas counsel must collect a wide variety of records, a "time consuming" process that is "vital" to begin early, "rather than in the last weeks or days before [the] application is due." *Id*. at 35. The State Bar Manual describes some of the records that should be gathered in every case: prison records, *school records*, *medical and mental health records*, and criminal records of witnesses. Second, habeas counsel must "energetically" collect information from all relevant

law enforcement agencies "that may have generated information regarding [the] client."*Id*. at 36. Third, habeas counsel or her investigator must interview potential witnesses, both those who testified at trial and those who did not, and in person where possible. *Id*. at 37.

The State Bar Manual observed that "it should be clear that the services of an experienced criminal or habeas investigator are invaluable in efficiently and comprehensively gathering the information necessary for a writ application." *Id*. at 38. "Other experts will likely be needed, too," including mental health and medical experts. *Id*.

In sum, the statute that governed Mr. Wheelan's appointment, the legislative history of that provision, and the contemporaneous standard of care in capital habeas proceedings mandated thorough extra-record investigation --- that he simply did not do --- prior to or after filing the application.

**2. This Court's decision in *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), should be revisited.**

This suggestion for reconsideration is an open invitation to this Court to use this case in order to revisit *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002). *Graves* addressed the question of the "competence" of habeas counsel required under Section 2(a) of Article 11.071 *without addressing at all the statutory description of competent performance in Section 3(a)* that so clearly

reflects the Legislature's expressed intent that appointed counsel perform in a manner befitting habeas corpus: in short, that counsel conduct *extra-record investigation*. This Court held in *Graves* that there is no "constitutional or statutory right to effective assistance of counsel . . . that can form the basis of a subsequent writ under article 11.071 section 5." *Graves*, 70 S.W.3d at 117-18. There is, however, a statutory right to investigation of the facts.[13] Compliance with such a duty to investigate could easily be defined as a low bar to reach that, even so, was not approached by counsel in Mr. Tercero's case, who for the most part apparently sat in his office and reviewed and read the record and, then, wrote about the record. From his billing records, Mr. Wheelan appears to have talked to Mr. Villarreal and to Mr. Tercero (once). Cases like Mr. Tercero's do not pose the kind of threat to finality that concerned the *Graves* majority: serial writs filed complaining of incompetence of the attorney on each prior writ. *Graves*, 70 S.W.3d at 114-115. The "expeditious investigation of facts" required by Section 3 is something that could be easily seen on a billing record, but it would have to constitute more than talking to the client and prior counsel. Mr.Tercero's case raises the question of what that performance should look like.

---

[13] Undersigned counsel, Walter Long, represented Napoleon Beazley along with David Botsford at the time when this Court accepted the question of competent representation raised by Graves. Beazley was stayed as a companion case and the undersigned recalls arguing to this Court that there was a pure statutory performance standard in Section 3, feeling frustrated that Graves' attorneys were not asserting it in their pleadings.

Alternatively, *Graves* should be revisited in light of the U.S. Supreme Court's equitable decisions in *Martinez v. Ryan* and *Trevino v. Thaler*. In *Trevino*, the Supreme Court held that *Martinez* applies to Texas, because Texas state habeas proceedings are the first meaningful opportunity to raise a trial ineffectiveness claim. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). The purpose is "[t]o protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel" from forfeiting review of such claims in state and federal court. *Martinez*, 132 S. Ct. at 1315-16. These Supreme Court cases, of course, do not control this Court's jurisprudence, but they inform it. *Graves* relied on *Coleman v. Thompson*. But the U.S. Supreme Court has now concluded that *Coleman*'s inflexible procedural default rule caused considerable harm to fair adjudication of substantial trial ineffective assistance claims of the sort now presented in Mr. Trevino's case. The Supreme Court now having modified *Coleman* with respect to trial IAC claims, this Court too should revisit its reliance on *Coleman* in *Graves*, in so far as ineffective assistance of state habeas counsel in an initial state habeas proceeding may serve as an exception to the Section 5 abuse of the writ rule. Such a limited modification of the law would protect the integrity of the right to counsel at trial, not open floodgates to unfounded state habeas ineffectiveness claims. Moreover, the key limitation of *Martinez* reasonably would apply within this

Court's jurisprudence: the modification to allow a new shot at proving ineffective assistance of trial counsel would apply only to the initial collateral review proceeding. In the instant case, Tercero diligently tried to obtain competent, appropriate habeas assistance *while* his state habeas attorney was providing his deficient representation, by trying to get Mr. Wheelan replaced, by trying to raise appropriate claims himself from behind bars with no investigator.

**3. Even under the standard of "competent counsel" in *Graves*, Mr. Wheelan was not competent.**

While ignoring Section 3, *Graves* maintains that the "competent counsel" required under Section 2(a), Article 11.071, is to be measured by the habeas lawyer's "qualifications, experience, and abilities" at the time of appointment," not by the lawyer's "final product of representation." *Graves*, 70 S.W.3d at 114. This Court agreed with Graves that it would be an "empty gesture to appoint incompetent counsel" and that "a 'potted plant' appointed as counsel is no better than no counsel at all." *Id*. It is the case, in fact, that counsel who do not function as habeas counsel are no better than a potted plant for the sake of their clients' cases. For all purposes, Mr. Wheelan provided no more help than a potted plant to Mr. Tercero. Complete lack of *relevant* performance by state habeas counsel cannot constitute "competence."

It is impossible, frankly, to define competence without reference to minimum standard of counsel conduct. The Texas lawyer disciplinary rules define competence as "possession of the legal knowledge, skill, and training reasonably necessary for the representation" of a client. Cmt. 1, Tex. Disciplinary R. Professional Conduct 1.01. "Competent representation contemplates appropriate application by the lawyer of that legal knowledge, skill and training, reasonable thoroughness in the study and analysis of the law and facts, and reasonable attentiveness to the responsibilities owed to the client." *Id*. Competent representation cannot be separated from competent performance. "Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners." Model Rules of Professional Conduct R. 1.1 cmt. 5 (2002). Mr. Wheelan was not "competent" by the standards of ethics as he failed to make relevant factual inquiry. Although he talked to trial counsel, probably because he was raising a wholly record-based claim of ineffective assistance and he apparently talked to the client once, he failed to otherwise *begin* a relevant factual inquiry into the case --- relevant to *habeas corpus*.

Mr. Tercero was victimized by Wheelan's lack of "the legal knowledge, skill, and training reasonably necessary" to represent an indigent state habeas

applicant. Because all potentially meritorious --- and actually meritorious (see below) --- extra-record claims were procedurally barred and dismissed in federal court without consideration, Tercero's federal proceedings were almost meaningless, for absolutely no fault of his own. In fact, Tercero (and/or his inmate friends) should be given credit for recognizing incompetent counsel at the time and trying to remedy it with pro se pleadings, especially the motion filed in this Court in which Mr. Tercero raised a meritorious ineffectiveness claim against trial counsel for failure to pursue mitigation investigation.

Mr. Wheelan's incompetence should be remedied by the provision of one state habeas proceeding for Mr. Tercero assisted by competent counsel, reopening the motion to amend that he diligently made on his own behalf long ago that barred by this Court at that time as an abuse of the writ.

# V.

## TRIAL COUNSEL FAILED TO RENDER EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT STAGE OF MR. TERCERO'S TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS BY FAILING TO CONDUCT MEANINGFUL MITIGATION INVESTIGATION[14]

A jury cannot make a constitutionally reliable and individualized sentencing decision without knowing the actual mitigating evidence about the defendant. *Gregg v. Georgia*, 428 U.S. 153, 206 (1976). Indeed, the importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of U.S. Supreme Court jurisprudence. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (the federal constitution requires that the sentencer "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982). A reasonable investigation into potential mitigating evidence in a capital case is thus an absolute prerequisite to constitutional representation. The core constitutional principle – that "respect for humanity" requires consideration of information about the offender – allows for no less. *See Lockett*, 438 U.S. at 602 (quoting *Woodson*

---

[14] This is the fourth "claim" in Mr. Tercero's "Applicant's Motion to Amend Petition for States Habeas Corpus [sic], No. 762351-A, *Ex parte Bernardo Adan Tercero*, 232nd District Court, Harris County, **Exhibit 2**, found to be a successive application and procedurally barred under Section 5 by this Court and given the number 62,593-02 in this Court's docket.

*v. North Carolina*, 428 U.S. 280, 304 (1976)); *see also Tennard v. Dretke*, 542 U.S. 274 (2004).

These longstanding requirements for defense representation in a capital case were not met in Mr. Tercero's case. Mr. Tercero respectfully moves that he be given the opportunity to have another first round of habeas solely in order to litigate the claim he attempted to raise in his *pro se* motion to supplement his initial application, while his appointed counsel was providing incompetent representation.

**Statement of Facts**

In order for this Court to see how Mr. Tercero has been harmed by trial counsel's deficient mitigation investigation, it is important to thoroughly revisit the facts of the case.

**Guilt/Innocence Phase**

Bernardo Tercero was convicted on October 16, 2000, of the capital murder of Robert Berger, a tenth grade English teacher at Reagan High School, in Houston, Texas. Mr. Berger was killed as he was dropping off clothes to be cleaned at the Park Avenue Cleaners, 4038 South Braeswood, with his three-year-old daughter Jordan at his side and his wife Melinda Winn Berger witnessing the event from just outside the store.

Besides Mr. Berger and his daughter Jordan, four other persons were present in the cleaners at about 7:00 PM, closing time, when the two Hispanic men entered through the rear door to rob the store: Michelle Johnson, manager and daughter of the store owner (16 SF 226); Dyesha Alberty, an employee who worked one of the counters in the front with Ms. Johnson (16 SF 228); Idalia Lima, who had been employed for about a year by Ms. Johnson to process newly arrived clothes in the middle of the store (*id.*; 16 SF 239); and Idalia's husband Ricardo Denillo Toruno, whose family had previously worked for the Johnsons in the store (16 SF 239) and who was married to Idalia.

Closing the store, Ms. Johnson asked Mr. Toruno to dispose of the day's trash in a bin behind the building. He unlocked a burglar-bar door when he exited the back of the store. Returning from the dumpster, he saw three men standing behind the bicycle shop next door and felt a little afraid when he heard one of the men say "follow him" as he approached the rear door. 16 SF. 159. Before he could secure the door, one of the men put a revolver to his head and ordered him to open it. 16 SF 159-60. Another darker skinned man also entered. 16 SF 162. The man with the revolver ordered Toruno and Idalia, his wife, to move aside into the clothing, and both men went to the front of the store. 16 SF 161-62. Toruno heard cash registers banging and heard "strikes against the wall" that sounded like a body

hitting the wall at the front of the store followed by one or two gunshots, accompanied by screaming. 16 SF 163, 167, 171. Then, he saw the two men come back through and leave the store, each with a money drawer in hand, the darker man commenting that they had "done wrong." 16 SF 164.

Dyesha Alberty, a cashier, was tagging clothes at a counter at the front of the store when Mr. Berger entered with his daughter to drop off clothes and struck up a conversation with Ms. Johnson at her counter. 16 SF 184-85. Suddenly, Alberty saw a dark skinned man in dark pants and a sports jacket appear from behind Ms. Johnson and walk around the counters toward Mr. Berger. 16 SF 186-87. Startled, Alberty ran toward the back of the store and then heard a gunshot. She had not seen a gun on the man who had passed her, although he had his hand in his right jacket pocket. 16 SF 188-90. But she saw another man carrying a gun running toward her from the back. 16 SF 191. She did not recall hearing any voices or noises or sounds of struggle before the gunshot went off. 16 SF 194. The "shooter" and the other man both spoke Spanish, but Alberty made out that they mentioned "money." Alberty accompanied them to the front of the store and gave them the cash drawers. 16 SF 194-95. The men immediately departed through the back door. Alberty saw Ms. Johnson holding Mr. Berger's daughter and, jumping over Mr. Berger, who was lying on the floor, she exited the front door and ran across the

31

street for help, hitting Melinda Berger with the door on the way out. 16 SF 196-97. On cross-examination, Alberty stated that she did not recall telling police that she had heard something in Spanish being told to Mr. Berger and that she had heard a fight taking place. 16 SF 221.

Idalia Lima's sister, Marisol Lima, was Mr. Tercero's girlfriend at the time of the offense. 17 SF 93-94. Idalia testified that, on an afternoon in March 1997, she, her sisters Jenny and Marisol, and Mr. Tercero had a meal before church, during which Mr. Tercero asked questions about her store: when it closed, what race the manager was, and how much money came in. 17 SF 97. She testified that, while her sisters were away from the table, Mr. Tercero told her he needed money and was going to rob the store with another person. 17 SF 98-99. She thought it a joke, but then she said he threatened that something would happen to her, her husband (Mr. Toruno, or her child, if she told anyone. 17 SF 99-100. She also testified that Tercero gave her money the next day to keep quiet and told her he had killed a man with a gun. 17 SF 112-113. Idalia testified that she initially did not tell police what she knew, because she was afraid of Mr. Tercero. 17 SF. 111.

Idalia testified that, after the first man came in the back door, pointing a gun at her and her husband, Mr. Tercero entered and ran to the front of the store asking for the manager in English. 17 SF 106. She also heard Mr. Tercero loudly say

"give me the money" in English. An argument ensued between Tercero and the customer, Mr. Berger. She heard the sound of a struggle over the cash boxes. 17 SF 106-07; 136-37. She heard sounds as though one had grabbed the other, and repeated sounds of collision with the wall. 17 SF 138-39. This went on for what she described as "five minutes" before she heard a gunshot. 17 SF 139. The man guarding her and her husband also went to the front. 17 SF 139. Then both men ran back from the front and out the back door with the cash drawers. 17 SF 107-08. The next day, Mr. Tercero told Idalia that he had no intent to kill anyone in the store and "he was trying to wait until there wasn't anyone in the cleaners." 17 SF 141. When he ran past her on the way out of the store, she overheard him tell the accomplice, "I fucked up, I hit him in the head." 17 SF 142.

Michelle Johnson, the store manager, testified that, when Mr. Tercero ran to the front of the store, he passed by her counter and went right up to Mr. Berger, grabbing him by the arm. 16 SF 242, 245. He said something to Mr. Berger, but Ms. Johnson could not understand it. 16 SF 243; 17 SF 40. A "scuffle," "struggle," ensued. 16 SF 243-44. The mens' bodies shifted and moved around as they grappled. 17 SF 49. The men changed positions throughout the fight. 17 SF 54. Not having a "clue" what was happening, Johnson stood at her counter. She said Berger and Tercero were "face to face" and Berger was trying to push off Tercero

33

who was pushing him back toward the front doors. 16 SF 247. This lasted about a minute. *Id*. The men continued to struggle always facing each other and, then, she saw a gun and saw Mr. Tercero shoot Mr. Berger on the back left side of his neck and Berger fall face-forward to the ground. 16 SF 244; 250-51. Tercero backed up and went to the rear of the store. 16 SF 252. Johnson then heard someone asking for money and she retreated to the side holding Jordan, Berger's daughter. 16 SF 252-53. Ms. Alberty gave the cash drawers to the men who fled out the back door. 16 SF 254. Throughout the battle between Tercero and Berger, Johnson never saw Mr. Tercero take his hands away from Berger to reload. 17 SF 52. She also did not know if Berger had fought for the gun, putting his hands on it. 17 SF 52-53.

Melinda Winn Berger, Mr. Berger's wife, waited in the car while he and Jordan went into the store. She testified that, at one point, looking through the store window, she thought she saw her husband falling, 24 SF 48. She looked again and thought, "there's somebody on him," threw open her car door and heard a gunshot. 24 SF 48-49. She wrestled with the door to the store failing to open it. Then Ms. Alberty let her in and she accessed her husband, who was bleeding profusely. 24 SF 49-50. Paramedics took Mr. Berger to the hospital and Melinda stayed with him there until he died the next day. 24 SF 53.

34

Sylvia Cotera, a young Mexican woman with an eighth grade education, testified that she had known Mr. Tercero for about a month before the crime. 18 SF 219. He was a friend who "would come over and sleep at [her] house." *Id*. She said that, when they were alone, Tercero told her that "he had shot someone trying to rob them" at a cleaners. 18 SF 220. Cotera claimed that Tercero gave her various reasons: (1) he became angry because the man did not have any money, (2) because a child (Jordan) had seen him; and (3) because the man himself "had seen his face." 18 SF 220. She said he expressed "worry" because "there hadn't been enough money" in the haul. 18 SF 221. Cotera testified that she did not go to the police with what she knew because "when the things happened and before" Tercero had threatened her not to say anything. 18 SF 221. She claimed that he threatened to burn her apartment along with her children if she told anyone. 18 SF 222. After this conversation, Mr. Tercero stayed with Ms. Cotera at her apartment for some days. 18 SF 232. He would periodically communicate with her thereafter. Cotera stated that the only persons she ever talked to about the matters in her testimony were three police officers who came to her house about a week before her testimony. 18 SF 229.

Bernardo Tercero testified that he lived with Marisol Lima and that, when they were having a hard time economically she suggested that she had worked for

a time at a dry cleaner and knew there was a lot of money there. 19 SF 25. She thought they could get the money easily and there would be no risks. 19 SF 26. They brought Idalia into the discussion when they went out to eat about one to three weeks before the crime. 19 SF 27. Idalia and Marisol took Mr. Tercero to the store and showed him how they would open the back door around 5:35 PM. 19 SF 30. The plan was for one of the women to signal Tercero with a pager when there were no customers. 19 SF 31. Paged four ones, it would be clear; paged four zeroes, customers were present and he would need to call Marisol. 19 SF 32. An acquaintance named "Chilango" (a coconspirator whose real name is Jorge Gonzales and to date has not been apprehended) expressed interest in joining Mr. Tercero in the robbery and said he would find the guns. 19 SF 33.

Mr. Tercero testified that he and Gonzales started waiting behind the cleaners around 5:30. 19 SF 34. They got the all ones page and saw the back store door was open. *Id*. Gonzales entered first, detaining Idalia and Mr. Toruno, and Tercero followed, going to the front of the store with the pistol Gonzales had brought him covered in his coat. 19 SF 37-39. Tercero testified that, when he arrived in front looking for the cash register, no one noticed him. So he took out his gun, raised it above his head, and moved the slide on it, making a noise. 19 SF 48. He repeated the action, getting attention, and loudly said, "Give me the money"

36

in English. 19 SF 48-49. Tercero then saw Mr. Berger standing in front of Ms. Johnson's counter. Berger turned to face Tercero and looked him in the eyes. 19 SF 54. Berger was taller than Tercero and weighed some sixty pounds more.[1] 19 SF 83. He started to move slowly and Tercero raised his hand saying "Stop!" 19 SF 53-55. According to Mr. Tercero, he took steps back but Mr. Berger advanced on him and grabbed for the gun. 19 SF 56. He pushed Tercero with his chest and they began a struggle that lasted about two minutes before Tercero tired and the gun went off. 19 SF 60. Tercero was surprised when Berger was shot and fell to the floor. 19 SF 62-63. Tercero and Gonzales grabbed the cash drawers and fled in their car from behind the store. 19 SF 64.

Tercero testified he spent the night with Sylvia Cotera and sold the two guns the next day.[2] 19 SF 65. That same day, Marisol and Idalia demanded to know why Tercero had killed Mr. Berger. He explained that they had struggled over the weapon. 19 SF 66. They discussed how the pager plan had gone awry, with Marisol sending the wrong signal. 19 SF 68. Tercero did not know if, when he pulled the slide back on the gun, any bullets came out. 19 SF 71. He also said Gonzales had given him some bullets he had in his pocket. *Id*. He stated he had not

---

[1] This testimony about size difference was elicited by the State.

[2] When asked why he kept the guns, although Gonzales brought them to the crime, Tercero stated: "It wasn't a decision that we discussed. That's how these circumstances appeared. And that's why I was the one that was in the front." 19 SF 113.

fired that gun before.[3] *Id.* Tercero testified that he told Cotera he had been in the robbery and that there had been a fight. 19 SF 112. He said he did not tell her anything about a little girl. 19 SF 113. He testified that Cotera's assertion that he said he shot Mr. Berger for fear he would identify him was a lie. 19 S.F. 114. He denied threatening her, Idalia, and/or Marisol. 19 SF 113.

In addition to fact witness testimony, the State presented forensics testimony from a pathologist, Tommy Brown, and ballistics examiner, Robert Baldwin. Brown testified about the autopsy of Robert Berger. 18 SF 82. Powder marks showed that the shooter was within two feet of Berger when he was shot. 18 SF

---

[3] The direct testimony is remarkable for the amount of times the prosecution was caused to object to the defense leading the witness. After six occasions, 19 SF 24,27,29,36,57,59, Assistant DA Ring asked the judge, "Your Honor, may I have an instruction of Mr. Villarreal discontinue leading his witness?" 19 SF 59. Admonition was given and, then, trial counsel immediately led Mr. Tercero again, causing Ms. Ring to object to counsel testifying. 19 SF 60. Moments later, she had to object again, "I object to counsel testifying. Would he please keep it to question and answer. He's leading the witness." 19 SF 69. Right away, another lead. 19 SF 70.

The cross-examination is remarkable for the amount of times Mr. Tercero appears confused by the questions. He asks Ms. Ring to speak slower. 19 SF 75. He explains to her that the translator "repeats a little behind." 19 SF 75. At one point, Tercero gets very confused when asked if Mr. Berger was facing him when he shot him. It becomes apparent that this is at least partly the result of translation. 19 SF 97-98.

Some cross-examination is substantively challenging, such as when Tercero has to explain an assertion that he did not know if the gun he had was loaded or not, essentially maintaining he just took the weapon Gonzales handed him without knowing if it would shoot. 19 SF 77-81. Tercero asks Ring, "Use terms that are more civil and more slowly and I will be able to listen." 19 SF 78-79.

In one passage, cross-examination confounds Tercero for no apparent reason, as when he cannot follow the prosecutor's attempts to have him show the jury how he passed through the store using an interactive video screen. He is instructed to touch the screen and a line will appear "as you've seen this week." 19 SF 84. Tercero seems baffled asking the prosecutor for different photos. 19 SF 85. Ms. Ring retorts, "Sir, this is your testimony, not mine." *Id.* Tercero presses on the screen to show where the cash register was. 19 SF 86. Ring challenges him, "I don't see any cash register in this picture." *Id.* Tercero insists it was there, about a foot and a half wide. *Id.* (In closing argument, the prosecution pointed out that there was no cash register. 20 SF 55-56.) Rummaging through the photographic exhibits, Tercero tries to show his path through the store, asking the prosecutor for patience. 19 SF 90. When he finds the photo he thinks will help, Ms. Ring condescends, "Look, sir, it's not that difficult." 19 SF 91.

110. Brown opined that, with the wound on the left side toward the back of the neck and nick the vertebral artery, the shooter would have been either behind Mr. Berger or would have reached around him. 18 SF 104.

Robert Baldwin opined that two unfired live rounds found in the store were from the same gun. 18 SF 150. Baldwin agreed that the bullets could have been removed from the gun without any attempt at firing. If somebody wanted to remove a round, "they would simply pull the slide back, [and the] bullet would pop out" with the same extractor markings. 18 SF 163. Baldwin found that a bullet could have escaped if one of two persons fighting over a gun were to pull the slide back. 18 SF 164. Baldwin added that the two rounds could have been ejected at the same time, with only one pull on the slide. 18 SF 168-69. One of the rounds had an indention signifying that an attempt to fire it had been made sometime. However, Baldwin testified that, whenever a gun is unloaded, the cartridges are cycled through the chamber and take on extraction marks. Police officers, for example, recycle ammunition, creating extraction marks. 18 SF 172-73. So the live rounds showed no evidence they had been cycled through Tercero's gun on the night of the offense. 18 SF 174. Baldwin concluded he had no way of knowing if either had been cycled or had fallen out of someone's pocket. 18 SF 174.

**Guilt/Innocence Charge**

The jury was instructed on lesser included offenses of felony murder and aggravated robbery. For the jury to convict of felony murder, it would need to find that Mr. Tercero had no intent to cause Mr. Berger's death. 20 SF 15. For the jury to convict of aggravated robbery, it would need to find that the gunshot was accidental. 20 SF 17.

**Guilt/Innocence Argument**

The defense explained to the jury that to find Tercero guilty of capital murder, it would have to be convinced beyond a reasonable doubt that Tercero "had the specific intention, conscious objective or desire to commit the murder. In other words, to have Mr. Berger dead." 20 SF 21. The defense argued that the proof of specific intent was not met. 20 SF 33-35. The shooting unquestionably occurred during a struggle. It was not, the defense argued, a case in which the robber went straight to the cashier and shot. 20 SF 35. Michelle Johnson, Mr. Berger's friend, testified there was a struggle and the crime diagrams showed a struggle that progressed from in front of Ms. Johnson's counter to the front door. 20 SF 38, 40-41. This was inconsistent with the idea that Mr. Tercero just went up to Mr. Berger with intent to shoot him. *Id.* Anticipating that the State might argue that Tercero shot and misfired once at Berger before the shot that killed him, the defense pointed to Tercero's testimony that he moved the slide back and forth on

the gun when he went to the front of the cleaners and, consistent with Baldwin's testimony, one or both of the recovered live rounds could have been expelled then. 20 SF 28. Secondly, if the gun had jammed, Tercero would have needed two hands to run the slide to eject the bad round and, significantly, there was no evidence of that. 20 SF 28.

The State countered with a mantra, "[G]uns don't accidentally go off during a robbery. Guns are used to eliminate witnesses during a robbery." 20 SF 52, 53, 55, 59, 60, 66, and 67. The State asserted that intent could be created in a split second. *Id*. All that was needed to show that Tercero intended to shoot Berger and intended to kill him in that act. *Id*. "A gun is used during a robbery to eliminate witnesses, especially when you're as calculated as Bernardo Tercero." *Id*. at 53.

The State's principal argument for intent was: "If [Tercero] didn't have the specific intent to do something to Robert Berger why did he round the counter and approach him?" 20 SF 55. The State argued only three adults saw everything that happened: the deceased, the defendant, and Ms. Johnson, stressing the importance of Ms. Johnson's eyewitness testimony. The State argued that Johnson, like Alberty, said Tercero went straight to Mr. Berger. Johnson said Berger was "defensive." 20 SF 58. Thus, the State argued that, although it is impossible to know what Mr. Berger was thinking, he was not being heroic in the face of a gun

with his three year old next to him. *Id*. The State argued that, as soon as Johnson saw the gun,[5] there was no struggle over the gun: just a gunshot. 20 SF 58. The State argued that the horizontal path of the bullet, rather than some crazy angle, showed intent.[6] 20 SF 59-60. The shot in the "back of the neck" was consistent with Johnson's testimony that Berger was trying to get away from Tercero. 20 SF 60. The State found intent to eliminate a witness in Tercero's statement that Berger looked him in the eyes. 20 SF 63. The State argued that the indented live round on the floor indicated that Tercero tried to eliminate the other witnesses, in particular Michelle Johnson, but the gun jammed, he ejected the cartridge and went to the back of the store.[7] 20 SF 64. Finally, the State argued that intent was shown by what Tercero said to Sylvia Cotera: that he shot Mr. Berger because the child had seen his face. 20 SF 66.[8]

The jury asked to see Michelle Johnson's entire testimony. 20 SF 70. When asked to be specific, jurors wanted to hear cross-examination of Ms. Johnson about Mr. Tercero's initial approach to Mr. Berger. 20 SF 74. As Assistant DA Hawkins

---

[5] Ms. Johnson testified that the struggle between Tercero and Berger lasted about a minute. 16 SF 247.

[6] The pathologist also testified that the shot could have occurred with the shooter reaching around Mr. Berger. 18 SF 104.

[7] This argument is purely speculative. Ms. Johnson, with her eyes on Tercero as he shot Mr. Berger, would have been perfectly capable of testifying that Mr. Tercero also pointed the gun at her if that were true.

[8] The state argued, "The defendant could not touch Sylvia Cotera. There is not one shred of evidence to indicate why she would make this up. None. That's what he said right after the crime." 20 SF 66.

put it, "The question says, the question that Bernardo Tercero rounded counter number two, initiating contact with Mr. Berger, grabbing Mr. Berger's right arm. And when we went through the direct with Mr. Denninger [defense counsel] we looked at the language where he was grabbing the arm other than the path situation." 20 SF 74. It appears from the record that the jury was read snippets of Ms. Johnson's testimony on direct and cross: 16 SF 242 (lines 13-17); 243 (lines 12-15); 245 (lines 2-10); 17 SF 41 (lines 18-23); 43 (lines 12-20); 45 (lines 19-22). 20 SF 75-76. All pertain to Mr. Tercero coming in to her left and grabbing Mr. Berger by the right arm. Subsequently, the jury found Mr. Tercero guilty of capital murder after deliberating for a long time. 24 SF 100 (Prosecutor: "[I]t took you guys a long time to come to a verdict."). The docket sheet for October 16, 2000, reflects that the jury began deliberations at 12:10 PM and ended at 9:47 PM, including some breaks, returning with a guilty finding. SHR 000200.

On December 18, 2000, an evidentiary hearing was held on Mr. Tercero's motion for new trial based on alleged misconduct with two witnesses, Idalia Lima and Maria Lucinda Alvarado. Idalia testified that she had met with Assistant DA Sally Ring prior to trial with DA investigator Gaston Rangel translating. MNT at 8. Idalia stated that, during that meeting, Ms. Ring instructed her on how she was to testify. MNT at 9. Although she had specifically told Ms. Ring that she saw

43

Tercero and Mr. Berger struggle over the pistol, Ms. Ring told her to say that she "did not see anything and that he threatened me." MNT at 8-9; 11. Ms. Ring told her not to say anything in favor of Mr. Tercero, or she would go to jail. *Id.* If she cooperated, Ring said she would give Idalia a letter so she "would not go to jail." MNT at 10. Idalia also testified that she informed the prosecutor she had heard Ms. Johnson say "help me" during the struggle between Tercero and Berger, and was told she "did not have to say that in front of the jury." MNT at 11. On cross-examination with Ms. Ring, Idalia stated she believed the sentence was inappropriate, because "[w]e know very well that there was a struggle and that man died, fought to take the pistol away and . . . it fire by itself." MNT at 17. She was impeached with the fact that she had lied in her first two statements to the police about not knowing who robbed the cleaners. MNT at 17-18. It was pointed out that, in all three police statements, she did not say she could see the scuffle, and Idalia said the police, too, threatened her. *Id.* Idalia told Ring that she had also told her not to divulge that the police had threatened her. MNT at 19-20. Idalia conceded they had had a discussion about whether exonerating things Mr. Tercero had told her would be allowed in under the evidentiary rules. MNT at 22-23.

Maria Lucinda Alvarado, Idalia's mother, testified in corroboration of Idalia's claims. MNT 25, 27, 28. On cross, Alvarado agreed she had received a

work permit due to her cooperation with the FBI getting Mr. Tercero to the United States. MNT at 37. She objected to Mr. Tercero's sentence being based on an "exaggeration." *Id*.

Gaston Rangel testified at the hearing that, when he and Ms. Ring met with Idalia, she did not tell them she had seen the struggle over the gun, nor did Ms. Ring ever tell Idalia to change her testimony or not mention certain things. MNT at 43. Ms. Ring's co-counsel, Bill Hawkins, also testified denying Idalia's accusations. MNT 54ff. He testified that, in the meeting he attended with Idalia, "[S]he was adamant that she had not seen the struggle." MNT at 59. Hawkins also described how FBI agent Rick Ganway had worked with Idalia Lima, Marisol Lima, and Maria Alvarado to get Mr. Tercero back to the United States. MNT at 63. Marisol Lima also was given a work permit and five to seven thousand dollars for her assistance in apprehension of Mr. Tercero. *Id.* Following brief arguments, the trial court denied the motion. MNT at 71.

**Punishment Phase**

**1. State Witnesses**

The State's punishment phase presentation consisted of four offenses, two misdemeanor theft convictions of Mr. Tercero under an alias, Carlos Arturo Gonzales, in Houston, Texas, in 1994 and 1995 (22 SF 5), prior to the capital

murder, and two unadjudicated felony offenses in Nicaragua that occurred after the capital murder and before Mr. Tercero's return to the United States and arrest.

The first of the Nicaragua unadjudicated offenses was armed robbery of then seventeen year old Jose Gonzales Gomez of money he had received for selling watermelons in August 1998 in Chichigalpa, Nicaragua. 22 SF 5,8-9. The man pulled a gun from under a newspaper and threatened to kill Gomez if he did not give over his watermelon money. 22 SF 16-18. He gave the man $300.00 US and the man ran and hopped on a bus. 22 SF 19. Gomez subsequently made a police report. Just before trial, Assistant DA Hawkins and Gaston Rangel showed Mr. Gomez a photo lineup in Nicaragua, in which he identified Mr. Tercero, 22 SF 23.

The second Nicaragua unadjudicated offense was a complicated scenario in which three men and one woman kidnapped a taxi driver (putting him in the trunk) in order to use his car for a kidnapping of a child (by the wrenching of the child away from his father in his own car). The somewhat unclear testimony showed that, in the process of the chaotic child kidnapping, Mr. Tercero shot the father in the leg.

Juan Antonio Lezema Arauz, taxi driver, testified that a group of three men and one woman hijacked his taxi in September 1998. A man sitting on the front passenger side, later identified by Mr. Arauz as Mr. Tercero, pulled a gun on him,

as did a man in the backseat, who also hit Mr. Arauz on the side of his head. 22 SF 55. *Id*. The man from the front seat told the others to tie up Mr. Arauz and take his things and, after they took his glasses and money, they put Mr. Arauz in the trunk. 22 SF 57-58. Sometime later, when they stopped and the trunk was opened, Mr. Arauz complained about binds on his hands. His hands were unbound and he was given some refreshment through a straw. The front seat passenger told him they would let him go, but that he must not make movements, or "that's as far as [he would] go." 22 SF 58-60. The trunk was closed. Then, after more driving, when the trunk was opened again, the front seat passenger said that they were going to finish him off, but they shut the trunk again and went on. 22 SF 60. After about four hours in the trunk, Mr. Arauz felt the car zig zagging, passing and falling behind another car. As the car stopped, he heard the woman say, "Look, look he don't want to give it." 22 SF 61, 63. A man's voice that he did not recognize said, "Just give him a few shots." 22 SF 63. He heard two shots, heard a child desperately crying as it was put in the taxi, and felt the taxi speed off. 22 SF 63-64. For about forty minutes the taxi sped with Mr. Arauz in great distress in the trunk. Then it stopped and someone said "the police, the police." 22 SF 65. Arauz heard five to seven shots, the child crying, and someone say, "Get the boy." 22 SF 67. He then said, "Don't fire, I am here," and police officers opened the trunk and let

47

him out. 22 SF. 68. He saw that the police had captured the woman and one of the men (not the man from the front seat). *Id*. In September, Mr. Hawkins and Mr. Rangel showed Arauz a photo lineup, in which he identified Mr. Tercero, and he made a courtroom identification of him as the man in the taxi front seat. 22 SF 72-73. On cross, it was revealed that the person who gave Mr. Arauz a refreshment through a straw was the man from the front seat. He also provided Mr. Arauz with some pillows. 22 SF 77.  Mr. Arauz admitted that is was unclear to him whether, when the front seat man said something about "finishing" it was about finishing "off" him or finishing what they were doing. 22 SF 78-79.  Mr. Arauz had been given the same photo of Mr. Tercero in Hawkins' lineup by a Nicaraguan police commissioner before he was shown the lineup by Hawkins and Rangel. 22 SF 83. Arauz conceded that his captors had guns yet no one hurt him. 22 SF 89.

Daniel Julio Chabarria, the father of the kidnapped four year old, owned a food and a clothing store. On the first of September 1998, Chabarria was driving his 1984 station wagon with his son Daniel about two blocks from his father's house, when he was intercepted by a white car (Mr. Arauz's taxi) that he thought was police.  22 SF 95-96, 99. Two men from the car immediately pulled guns on Mr. Chabarria, one standing to his left at the driver's side window, the other entering the front seat from the right. The man at driver's side told Mr. Chabarria

48

not to move, it was a kidnapping. 22 SF 102. Then, as a woman on the street tried to intervene, the man took the boy from Chabarria's right arm while simultaneously shooting him in the lower left leg below the knee. 22 S.F. 123. The man took the boy to the white car and gave him to the woman in the car. 22 SF. 104. Chabarria simultaneously grabbed for the gun of the other kidnapper in his car who shot him in his hand. Another (or the same) man outside the car fired on him shooting him in the upper leg. He ultimately landed on the ground. 22 SF 105-10. He was taken to the hospital where he gave a written police statement. Chabarria realized that he knew the man (or one of the men) who shot him in the leg, because he had been in his store and he had visited him once in his house. 22 SF 111. One of the man's aunts was an employee of his. *Id*. Thus, he told the police his name, Bernardo Tercero. 22 SF 112. Chabarria agreed that, as Tercero was an arm's length away when he shot him, he could have killed him if he wished, but stated "he did not want to kill me." 22 SF 134.

The State also put on a lieutenant from the Nicaraguan National Police, Luis Gonzales, who testified about his participation in the police response to the Chabarria kidnapping. 22 SF 143. When witnesses reported that three of the assailants had left in a car with the boy and one had run away on foot, police pursued all. They were able to capture the one on foot and borrow citizen cars to

chase after the taxi. 22 SF 145. About an hour and ten minutes into the chase, they found the taxi on a dirt road. 22 SF 150. Two men got out of the taxi in a hurry, fled, and then from a distance fired upon Gonzales. 23 SF 5. There was chase, then gunfire again. 23 SF 6-7. Gonzales fired back until his gun jammed. 23 SF 7. He cleared his weapon, fired again, and it jammed again, so he gave up pursuit and the men escaped. 23 SF 7-8. The boy and taxista were rescued. 23 SF 8-9. Gonzales had recognized one of the men who had fired on him from the streets before, where he had observed him wearing jewelry, which was unusual. This was Mr. Tercero. 23 SF 15. Gonzales made subsequent attempts to arrest Mr. Tercero, obtaining photos of him from his family in the process. 23 SF 19.

Gaston Rangel, DA investigator, testified about his trip to Nicaragua with Asst. DA Hawkins to show photo arrays to prospective witnesses who came to testify for the State. 23 SF 68ff. FBI agent Richard Ganway testified about how Mr. Tercero was lured back to the United States through Marisol Lima, who was paid $5,000.00 for her help. 23 SF 100. According to Rangel, Idalia Lima was not so remunerated. *Id.*

## 2. Defense Witnesses

The defense put on eight family and acquaintance witnesses that trial counsel, Mr. Villarreal, personally obtained from Nicaragua right before trial. He

introduced them and summed up the defense case by stating he had "[a]pproximately eight witnesses that should be fairly short." 23 SF 103. The brief testimony of all eight was almost identical: Mr. Tercero was a good teenager, had no bad habits, was a good student, helped his grandfather, and could be rehabilitated. Testimony also was presented about how Mr. Tercero helped to rescue victims of Hurricane Mitch, which hit Nicaragua in the last days of October 1998. Some pled for Tercero's life, stating that Mitch had already killed a lot of his family.

Carlos Ruiz Molina, uncle, described Tercero as an excellent teen, having no bad habits, and helping his grandfather Don Francisco clean and plant corn. 23 SF 107. He was raised by his grandparents and never did anything wrong. 23 SF 110. Tercero could be rehabilitated. 23 SF 107. Molina told the jury that the family had already lost sixty members to Mitch and asked for forgiveness on the part of the family. 23 SF 108-110. On cross, Molina was asked if he had been aware of the capital murder, thefts in Houston, and the offenses in Nicaragua. Only the capital murder he had been made aware of "a little bit ago when we were notified." 23 SF 111. He opined that, in light of the crimes, Tercero could be rehabilitated but admitted he had had little contact with him since he was age 19. 23 SF 112.

Gregorio Berrios Alvarez, a fellow industrial machinery repair school student, testified that for four or five years starting at about age 13, he saw Tercero helping his grandfather with the beans and corn on weekends. 23 SF 116. Tercero's family was very poor. *Id*. He was not disrespectful and did not use alcohol or tobacco or swear. 23 SF 117. Tercero was a good student, he studied hard. 23 SF 119. When *defense counsel* asked if he was aware that Tercero had been convicted of capital murder, Alvarez responded, no, that he was not aware of what Tercero had been accused of. 23 SF 118. On cross, Alvarez denied Tercero was "good" at "repair[ing] industrial machinery." When asked to clarify what he meant by "good student," Alvarez replied, "because I would see him study hard." 23 SF 120. He did not know Tercero's grades, but said he made it to his third year. *Id*. The prosecution grilled Alvarez on his lack of knowledge of Mr. Tercero's capital murder offense and the offenses in Nicaragua, questioning how he could believe in Tercero's potential rehabilitation with that record. 23 SF 123-128. On redirect, Alvarez stated he believed in Tercero's rehabilitation because the family was poor but honest and Tercero was a "good boy." 23 SF 128.

Michael Alberto Mondragon, 21 years old, gave brief testimony that he was three and Tercero five when they met and they also went to INO Tech school together. 23 SF 129-30. He saw Tercero often until Tercero was 18. For two years

Tercero lived at Mondragon's house during the work week while attending the the industrial school. On direct, Mondragon said Tercero was a "very good" student. 23 SF 130. "He tried to help [other students] that did not understand the classes." *Id*. Tercero was "smart." When Mondragon was asked if Tercero helped him, he answered, "Yes, and also a lot of the fellow students." 23 SF 131.

Gilma Berrios Alvarez testified that she was around Mr. Tercero almost every weekend from when he was two years old until eleven at the house of one of his uncles. 23 SF 166. He lived at her house from age 11 to 18 because he did not have a way to commute home from INO Tech school. 23 SF 168-69. He was good child. 23 SF 167. He helped his family. 23 SF 168. As a teenager, he was "well mannered" with Alvarez. 23 SF 169. He was a "good student" meaning that "he carried good grades." 23 SF 169. He left for the United States at age 18 as a "very simple man . . . due to the poor state in which he lived." 23 SF 171. Defense counsel[9] tells Alvarez that Tercero has been convicted of "capital murder" and she says "I cannot believe it." *Id*. Defense counsel asks if she is aware that Tercero was involved in an armed robbery and a kidnapping in 1998, and she responds that she was unaware. *Id*. When counsel asks if Tercero can be rehabilitated, she responds, "Yes. Because for God there's nothing impossible." Counsel asks if she

_____

[9] This is the first witness that defense counsel has informed on the stand about Tercero's present conviction and criminal history. The prosecutor previously had the distinction of asking first, and getting replies from the witnesses that they were ignorant of the offenses.

believes in Tercero, and she replies, "From the deepest part of my heart." 23 SF 172. On cross, the witness admits that she was aware Tercero was a suspect in the kidnapping case from the news and that she did not tell police where he was (adding that she did not know). 23 SF 175. She admitted she would do anything to help him. *Id*.

Maria Auxiliadora Herrera Montalvan, a friend of Tercero's mother, testified that his mother's parents raised him. 23 SF 177. He was a "good working boy" helping his very poor grandparents in the field, picking corn, planting beans, carrying water, and grinding corn. 23 SF 178. In October 1998, Hurricane Mitch caused a mudslide. Montalvan worked with the Nicaraguan Red Cross which was involved in removing bodies and saving live people from the mud. 23 SF 178-179. She saw Mr. Tercero seven times working to help with the mud slide during the fifteen days of the rescue. 23 SF 180. On cross, Montalvan expressed amazement and disbelief at what she has been told about Tercero's offenses, yet said they did not change her view of him being a good person. 23 SF 184-85.

Luis Antonio Maldonado, a 52 year old man who lived with Mr. Tercero's grandparents and had known him since he was a small child, testified about Hurricane Mitch. 23 SF 186. Mitch took away five communities, killing 2,753 people. Involved in the rescue effort, Maldonado directly saw Tercero over three

days taking children and elderly people out of the mud, and transporting them to rescue helicopters. 23 SF 187-88. Tercero lost 60 family members in Mitch. *Id.* When he lived with Tercero as a child, he found him well mannered, "very cordial." 23 SF 188.

Lydia Tercero Hueto, Mr. Tercero's mother, testified that Bernardo is the oldest of six sons and that she and he lived together. 23 SF 191. She never married Jesus Tercero, his father, who in turn never supported Bernardo. 23 SF 191-93. As a boy, Bernardo tried unsuccessfully to have a relationship with his father, who was married to another woman. *Id.* Bernardo was raised by his grandparents, her father Francisco Tercero and mother Amanda Hueto. *Id.* Bernardo was a "very good student." 23 SF 193. Bernardo himself carried her in his arms fifty meters out of the mud of Hurricane Mitch, and she watched him take other people out. 23 SF 194. Ms. Tercero pleaded for mercy from the jury because Bernard was "the oldest son and he is the one that would help me because I am very poor." 23 SF 195. Then she expressed "very much" love for him. 23 SF 196.

Carlos Alonzo Tercero Huerto, Mr. Tercero's uncle, testified that his and Lydia's parents, who raised Mr. Tercero, were very poor with fourteen children whom Bernardo joined in their household. 23 SF 198. The family rented acres to plant and Tercero's grandparents and their older kids worked the acres farming. 23

SF 199. Tercero's father Jesus was a produce grower. 23 SF 197. Heurto and his siblings would tell Mr. Tercero that his father had money, but when he looked for his father his father was offended by Bernardo's poverty. 23 SF 199. One of his step-brothers (with his father's wife) also prevented Bernardo from approaching his father. 23 SF 202. Bernardo wore to school the clothes of his uncle Javier, who was his same age, and sometimes went without shoes. 23 SF 200. Mr. Tercero was a "[g]ood [elementary] student . . . [e]ven though he had to borrow some books from friends." 23 SF 200. Huerto testified that "with difficulty [Mr. Tercero] studied elementary [and] he could not finish junior high. He had to go to a school, medium technical school, also with difficulty because there was no money." 23 SF 200. Trial counsel asked, "What difficulties?" and Huerto replied, "Economic." 23 SF 201. He explained that Tercero would have to ask for rides to school and get up very early. *Id*. He was well mannered, helped his grandparents in the field on weekends, did not use vulgar language or alcohol, and had only one ambition: to "study." 23 SF 203. When he was 18, Mr. Tercero left Nicaragua for the United States, in order to help his grandparents. 23 SF 203. Mr. Huerto testified that Mr. Tercero studied about 2 years in technical school, but "twelve" years overall, including "elementary." 24 SF 4. He went to the "elementary institute" and then the "medium technical school." 24 SF 5. Mr. Tercero stopped going to school to

56

help his grandfather for about three months before leaving for the United States. 24 SF 6. After a year and a half in the United States, Mr. Tercero returned to Nicaragua, where he continued to help his grandparents and an uncle who died in Mitch. 24 SF 7. Sixty family were lost in Mitch. 24 SF 10. Huerto pleaded with the jury for a punishment less than death. 24 SF 16.

Donald Davis, Sergeant in the Harris County Jail, testified that Tercero's only "offense" during pretrial detention was a writeup for "tampering." 23 SF 136. He was found covering the window of his cell with a newspaper, for which he pled guilty and was given three days without privileges. 23 SF 141-42.

Juan Cortez, a Catholic chaplain in the Harris County Jail, appeared at trial and asked the defense attorneys if he could testify on Tercero's behalf. 23 SF 164. He had been in contact with Tercero since his time of arrival in the jail. He had never seen any indication of trouble in Tercero's interactions with other inmates. 23 SF 149. He was observing change for the good in Tercero and sincere spiritual development.  23 SF 150-52. He saw no indication in Tercero that he would be violent again. 23 SF 152.  On cross, the chaplain stubbornly refused to state that he could be wrong about Tercero's sincerity and rehabilitation potential. 23 SF 159, 160. The prosecutor asked, "Do you think it's possible that a person that plans crimes . . . might be more difficult to rehabilitate than someone that doesn't plan a

crime?" and agrees that someone who manipulates might find rehabilitation harder. 23 SF 162.

### 3. State Rebuttal Witness

Melinda Winn Berger, the wife of the victim, gave victim impact testimony. 24 SF 27ff. In addition to sharing the history of her relationship with her husband and her experience of his death in the hospital, she painfully described how Jordan, their daughter, was still crying herself to sleep at night and seeing a therapist to deal with flashbacks of the crime. 24 SF 58-59. The hardest thing for her, she said, was raising Jordan without Mr. Berger. 24 SF 62.

### Arguments

Defense counsel argued that the defendant shrouding his cell with a piece of paper over its window was a non-violent incident and that he had no other incidents of any kind, including aggression or violence, while awaiting trial in the Harris County jail. 24 SF 72. The chaplain vouched Mr. Tercero was peaceable and a sincere believer. 24 SF 73, 75. Mr. Tercero would peaceably serve a life sentence. 24 SF 78. Counsel criticized the quality of evidence supporting the unadjudicated Nicaraguan offenses. 24 SF 83, 86. Counsel appealed to residual doubt: "If there is a possibility that this would not have been a capital murder case but for the fact that there was a struggle or possibly a fight for the weapon, then do

not, do not impose the death penalty in this case." 24 SF 90. In addition to raising residual doubt and an argument that "it's never okay to take the life of another human being, counsel's mitigation argument was confined to:

> You talked about . . . mitigating circumstances. I brought you a poor family. I know some of you got bored when you heard some of that, but I thought it was important for you to know this young man here basically came from extreme abject poverty. Not using it as an excuse, but it's important for you to know that it's not like he starts off the way all of us have had our lives. I know, it's – it starts off that way, comes from a good, hard-working humble family. No doubt about it. All those people are good people.

> Talked about how poor he was, how tough his schooling was. You heard that. And I bring you that not for you to consider that as a circumstance, but for you to get just an idea of the picture. We talked about maybe someone doing some deed that could be mitigating. . . He was out there helping [in the aftermath of the mudslide].

24 SF 93-94.

The State initially dismissed Mr. Tercero's family and friend good character evidence in one short paragraph;

> You heard from his family, they said he was a good man, he was a good child. Well he likes his family. They've been nice to him. Well of course he gets along with them. But God forbid . . . you're a target to him. You're somebody he sets his sight on and then he becomes a threat.

24 SF 103. The State returned to argue that Tercero was lucky to have been raised by loving grandparents. "No matter what you do, they're still going to love you." 24 SF 113. "Remember, he was doing okay. He was respectful with his parents no,

bad habits [sic], things of that nature. So he wasn't, he wasn't harmed by being raised by his grandparents. No mitigation there." 24 SF 113.

The State undercut poverty as mitigation by simply comparing him to the watermelon salesman, State's witness Jose Gonzales, who said he was "trying to scratch out a living as a fisherman and farmer instead of committing God-awful crimes." 24 SF 114.

The State noted that Mr. Tercero had " a lot more education than" some of the other Nicaragua witnesses, yet he was the one "out there committing cap crimes." 24 SF 114.

The State argued the only mitigation that had been presented was the "mud slide rescue," which did not stack up against Tercero's alleged "willingness to commit violent crimes again and again and again." 24 SF 118-19.

The State projected its view of Tercero was that he was a "walking, talking continuing threat. . . . We know that Bernardo Tercero is a master manipulator. He manipulated Idalia and Marisol, he manipulated his victims over in Nicaragua. Not you, not you. He's not going to manipulate you." 24 SF 102. "Folks, you all were judges of that defendant's character when he testified. And you saw and heard the lies that he told you. You know that he can manipulate or tries to manipulate." 24 SF 104. "[T]hink about his role in this deal at Park Avenue Cleaners. Who was the

ring leader? That man. Who had the inside, Marisol and Idalia Lima? That man. Who got Chilango or the co-defendant to come along? That man. Who went up to the front and held up everyone at gunpoint? That man. It was very planned out. That's a man who is a threat. All the information he got, all the steps that he took to make sure he was successful." 24 SF 105-106. The State argued that Tercero could have gone back to Nicaragua and sold watermelons. "Instead he chose to be the demon that he is." 24 SF 108. The State argued that Tercero "planned out" the simple watermelon salesman robbery by himself. "He waited until no one else was there. He waited until the bus was ready." 24 SF 109. In reference to the kidnapping, the State argued, "Look at his role. . . . So whose idea do you think this was [to kidnap the businessman's child]? This defendant develops the plan, goes to [the taxi driver and asks him to pick up the group]. . . . Gets his cohorts with him, pretend they're going for a cab ride. Jump Mr. Ledezma, tie him up, put him in the trunk at gunpoint. And who's giving the orders? You heard Mr. Ledezma; it was Bernardo Tercero, tie him up, don't move, don't look at me, I'm going to untie your hands." 24 SF 110. "What kind of beast makes a child the focus of the crime. They were taking that kid for money. The defendant knew that and the defendant planned that." 24 SF 110-111.

As with guilt/innocence, the jury deliberated long and hard on Mr. Tercero's punishment. The docket sheets reflect that the jury began deliberating at 3:15 PM on October 19, 2000, deliberated with two short breaks until 9:30 PM, and recessed until the next day. SHR 000205. The jury resumed deliberating at 9:55 AM on October 20, 2000, took an hour and fifteen minute break for lunch, and returned with its punishment verdict at 2:30 PM.

**Trial Counsels' Performance Was Deficient**

Under *Strickland v. Washington*, 466 U.S. 668 (1984), counsel performs deficiently by engaging in conduct that falls below an objective standard of reasonableness under prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Formal standards of professional practice can be "important guides" in determining whether counsel performed deficiently. *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) (referring to ABA standards). In evaluating a claim that counsel failed to adequately investigate, *Strickland* holds that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691.

Prejudice is shown when, "but for counsel's unprofessional errors," there is a "reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The reasonable probability standard

requires only "a probability sufficient to undermine confidence in the outcome." *Id.* It does not require a showing that counsel's deficient conduct "more likely than not" altered the verdict. *Id.* This is because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if* the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694 (emphasis supplied). For example, the standard can be satisfied if, had counsel performed effectively, it is reasonably probable that a single juror might have "struck a different balance" as to the weight of the evidence. *Wiggins*, 539 U.S. at 537; *Loyd v. Smith*, 899 F.2d 1416, 1426 (5th Cir. l990) (before concluding "no prejudice" under *Strickland*, reviewing court "must be confident that at least *one juror's* verdict would not have been different had the new evidence been presented") (emphasis added).

A reviewing court must also consider the harm that can result at both phases of trial from a deficient pretrial investigation. Errors made in the guilt phase (including those that have their genesis in an inadequate pretrial investigation) must be evaluated for both their effect on the jury's decision to convict and any potential impact on the sentencing phase that followed. *See Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) ("reject[ing the] notion" that guilt-phase

ineffectiveness "may not be deemed to prejudice a capital defendant during the punishment phase").

When evaluating the prejudicial effect of numerous errors made throughout counsel's representation, a reviewing court should not treat each error in isolation. Instead, the question is whether the *cumulative* effect of all of counsel's errors, omissions and oversights undermines confidence in the result. *Williams*, 529 U.S. at 397–98 (a reviewing court applying *Strickland* must assess "prejudice" by considering mitigating evidence cumulatively, rather than piece-by-piece); *see also Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence").

**1. The prevailing professional norms at the time of Mr. Tercero's 2000 trial required that counsel conduct a thorough investigation into potential mitigating evidence.**

The Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded

from considering *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *id*. at 604. Likewise, the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), such as a "troubled youth," *id*. at 107.

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard*, 542 U.S. at 286. Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604).

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304. A jury can consider evidence in mitigation, however,

only if trial defense counsel vigorously investigates and presents the available evidence.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996). *See also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[t]he imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing").

The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community. *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 SANTA CLARA L. REV. 1069, 1085-86 (1996)).

In *Bobby v. Van Hook*, 130 S. Ct. 13 (2009) (*per curiam*), the Supreme Court stated that "[r]estatements of professional standards, we have recognized, can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Van Hook*, 130 S. Ct. at 17 (emphasis added). Subsequently, the Supreme Court illustrated the sources from which courts can ascertain professional norms of criminal defense practice. In *Padilla v. Kentucky*, 130 S.Ct. 1473, 1482–83 (2010), in which the Court deemed deficient counsel's failure to advise a non-citizen defendant about the immigration consequences of a guilty plea, the Supreme Court relied on the ABA guidelines, as well as numerous other sources, to determine the prevailing standard of care. "Authorities of every stripe," as well as reported decisions describing Texas capital trials, confirm that the mid-1990's standard of care, like the 2003 ABA Guidelines, required a thorough social history when preparing to defend a capital case. As in the current ABA Guidelines, "the duty to investigate mitigating evidence" was prescribed "in exhaustive detail, specifying what attorneys should look for, where to look, and when to begin." *Van Hook*, 130 S. Ct. at 17. Well-defined national capital defense norms in place since the mid-1980's required counsel to seek out a wide range of mitigating evidence. *See, e.g.,* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation,*

*or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986, at pp. 16–17) ("Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory personnel . . . .  A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present . . . .  Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny."); *see also id*. at 16 ("[A]ttorneys are not trained in . . . dealing with the psycho-social problems of their clients and explaining these to the jury.  Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that they do not have the skills to accomplish the goals of mitigation and to go and seek the assistance of psycho-social professionals who are skilled in these fields.  For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant."); Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION, Aug. 1985, at pp. 27–31 (instructing capital defense counsel to thoroughly investigate the client's background by collecting documentary evidence and interviewing witnesses related to family background, medical history, school performance, military experience, work history, psychological profile, criminal

record, institutional record, significant others, religious background, drug/alcohol history, geography, skills and talents).

Decisions from this Court applying *Strickland* to cases tried prior to Mr. Tercero's in 2000 confirm that this was the prevailing standard of care in Texas. For example, *Ex parte Gonzales*, 204 S.W.3d 391, 393–96 (Tex. Crim. App. 2006), held that trial counsel were deficient for not investigating whether the client had a history of child abuse even though counsel "never even dreamed" it was an issue relevant to his client's case. On July 20, 1994, Gabriel Gonzales, along with four other members of the Crips gang, robbed a pawn shop to get guns and money. *Id*. at 393. "While his accomplices were smashing display cases and stealing guns, [Gonzales] chased one of the proprietors of the shop into the back of the store and shot her. Then he returned to the cash register and forced an employee to open it." *Id*. Gonzales was sentenced to death.

Gonzales' trial counsel interviewed Gonzales about his life from birth up to the trial. *Id*. at 394. Counsel also talked to the client's mother once before trial, and to the client's sister during trial. None of them revealed that Gonzales was frequently sexually and physically abused when he was small child. Unbeknownst to trial counsel, the mother believed that the father was sexually abnormal and used excessive force on the children and, when she learned that her husband was

sexually abusing their daughter, she notified the police and obtained a divorce. *Id.*

Trial counsel stated that he

> *did not ask [the family members] or the applicant about any specific topics* such as abuse in the applicant's past. His interviews with the mother and sister started "globally in nature," but he "never even dreamed" of the issue of abuse, and he "certainly didn't really inquire about it." He did ask the applicant about how he grew up. "I just start from the beginning, you know, tell me all about you. Where were you born and so forth, leading them up to—to this time." The applicant did not volunteer any information about abuse. The sister testified at the habeas hearing that she did not volunteer information about the abuse because she is ashamed of having been abused and it is not very easy to talk about.

*Id*. at 394–95 (emphasis added) (footnotes omitted).

Although Gonzales's trial counsel had interviewed both Gonzales's mother and sister about Gonzales's background—the sister even testified at punishment to Gonzales's difficult childhood and his borderline mental retardation—Gonzales's counsel never specifically asked these potential witnesses whether Gonzales had been abused, and thus did not present evidence of abuse at sentencing. *Id*. at 394–95.

Gonzales' post-conviction counsel hired a psychiatrist who, after interviewing Gonzales and reviewing some of his records, diagnosed him with "chronic post-traumatic stress disorder, attention-deficit disorder with hyperactivity, mixed personality disorder with explosive and antisocial traits,

70

hereditary epilepsy, dyslexia and other learning disorders." *Id*. at 395. Quite parallel to neuropsychological findings very recently made by an examination of Mr. Tercero, Mr. Gonzales' psychiatrist concluded that Gonzales was "an individual who at an early age had [neurological and learning disorders]. He also had stigmata of Post Traumatic Stress Disorder. . . and a Borderline Normal Intelligence Quotient which would lead to poor processing of information and probably lower level of control of behaviors." *Id*. at 395–96.

Because counsel was not aware of this information, the issue before this Court was whether counsel failed to conduct a reasonable investigation to uncover mitigating evidence. The trial court found that trial counsel were not deficient because the abuse information was known to Gonzales and he did not mention it to trial counsel. *Id*. at 396.

This Court disagreed, holding that the failure to investigate and inquire into the subject of abuse when interviewing the client and relevant witnesses fell below an objective standard of reasonableness for Texas capital trial counsel and rendered trial counsel's mitigation investigation unreasonable. *Id*. at 397. This Court noted that the Supreme Court had made clear in *Penry v. Lynaugh*, 492 U.S. 302 (1989), that the pre-1991 Texas sentencing statute violated the Eighth Amendment when it precluded consideration of mitigating evidence beyond the scope of the special

issues. In a footnote, this Court catalogued numerous cases tried under the former statute in which counsel had investigated and presented mitigating evidence. *Gonzales*, 204 S.W.3d at 396 n.32.

In 1991, the Texas capital sentencing "statute was amended to comprise a much broader range of mitigating evidence, namely, 'all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant.'" *Id*. at 397 (footnote omitted). According to *Gonzales*, courts must assess counsel's preparation for the punishment phase in light of this development. Relevant mitigating evidence clearly included "the defendant's childhood and his physical and mental health." *Id.* Thus, "at the time of [Gonzales' trial six years before Tercero's] an objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child." *Id*. at 397.

In granting relief to Gonzales, this Court announced that, in a post-1991 trial, capital defense counsel were *required* to investigate the client's childhood and mental health—even in a case in which (1) counsel, *before* investigating, "never even dreamed" what the investigation would turn up; and, (2) counsel interviewed family members who did not spontaneously volunteer information. Put

differently, at the time of Mr. Tercero's trial, Texas capital defense counsel had a duty to independently investigate mitigating circumstances related to mental and physical health, and the client's childhood, regardless of whether the information was volunteered by the client and his family. *See Moore v. Johnson*, 194 F.3d 586, 617 (5th Cir. 1999) (holding, when overturning a 1980 Houston death sentence, "that [because] counsel's conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, we find that there is no decision entitled to a presumption of reasonableness under *Strickland*").

Judge Cochran's concurring opinion in *Gonzales* further clarifies the applicable professional norms. "[D]efense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. *The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself.*" *Ex parte Gonzales*, 204 S.W.3d at 400 (Cochran, J., concurring) (emphasis added). The Supreme Court has made it clear that "defense counsel may be required to investigate potential mitigating facts even when the defendant is 'uninterested in helping' or is 'even actively obstructive' in

developing a mitigation defense." *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374 (2005)).

At the time of Mr. Tercero's trial, the prevailing professional norms required counsel to conduct a thorough mitigation investigation. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989) (investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing to 1989 ABA Guidelines to establish prevailing professional norms in 1989 capital trial). The Texas and national practices reflect "well-defined norms" for mitigation investigation, and thus the floor below which counsel may not descend. *Wiggins*, 539 U.S. at 524–25; *Rompilla*, 545 U.S. at 380.

The Texas standard of care is reflected in the ABA Guidelines specifying that counsel should investigate the defendant's full history, including "medical

history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse)." 1989 Guideline 11.4.1.D.2. Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death." 1989 Guideline 11.4.1.D.3. Counsel's duty "is not discharged merely by conducting a limited investigation." *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007). Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

Terminating the mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527–28. Even if counsel performed some investigation, that does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388–89; *Wiggins*, 539 U.S. at 527, 534.

Under the circumstances of Mr. Tercero's case, counsel had an obligation to secure the assistance of experts in a capital trial. 1989 ABA Guideline 11.4.1

("Counsel should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation"); *see also* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986, at 18 ("The use of social workers and psychologists as part of the defense team is a necessity—not a luxury."); *Sears v. Upton*, 130 S. Ct. 3259, 3264 (2010) (holding trial counsel ineffective, in part, for failing to present expert testimony that could have helped jury better understand defendant in a 1993 capital trial because "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive"). Here, that duty was heightened because counsel represented to the trial court that expert assistance was necessary to effectively prepare for the punishment phase, and the trial court *agreed and authorized funding for an expert*.

**2. Trial counsel's performance fell way below prevailing norms.**

In the first place, trial counsel did not move for funds nor obtain a mitigation specialist/investigator. On reading through trial counsel's files, the undersigned has seen no social history and no evidence that a now missing social history might have been worked up as a basis for further mitigation investigation. The files contain none of the usually collected documentary evidence related to such things

as family background, medical or psychological history, school performance, work history, institutional records, religious background, drug/alcohol history, geography (anything pertaining to Nicaragua, the revolution occurring when Mr. Tercero was born, the "Contra war," the culture, farming hardships [e.g., droughts, floods, pesticides], politics, gender roles), or particular skills or talents of Mr. Tercero. There is virtually nothing in the file designed to individualize Mr. Tercero and evoke the jury's sympathy, except for a list of family and friends that Mr. Villarreal obtained from Mr. Tercero, which led to the trial testimony (see infra).

Trial counsel moved for funds for one expert, a forensic psychologist, but only had the appointed psychologist, Dr. Jesse Reed III, see Mr. Tercero at a very late date in the trial process, within a couple of weeks of trial, and only asked Dr. Reed to evaluate Mr. Tercero to answer the State's anticipated evidence of future dangerousness, the capital murder and the unadjudicated Nicaragua offenses, which were detailed in a letter for Dr. Reed.[15] Dr. Reed made no report observed

---

[15] On September 25, 2000, Mr. Villarreal asked the Harris County jail to give Dr. Reed access to the client. **Exhibit 6.** On September 29, 2000, Mr. Villarreal sent a letter to Dr. Reed (and his partner Dr. Ramon Laval) requesting specifically that Dr. Reed assess and evaluate Mr. Tercero in relation to the prosecution's upcoming attempt to prove Mr. Tercero a "future danger." **Exhibit 7** (Letter from Gilbert Villarreal to Dr. Jesse Reed III and Dr. Ramon Laval, Sept. 29, 2000). The three page letter describes the principal offense and the unadjudicated Nicaraguan offenses in detail and closes stating, "The prosecutors . . . [are making] an effort to persuade a Jury to give the Death Penalty to the Defendant, Bernardo Tercero, to prove that he is a 'future danger.' Please advise us as to what assistance you can provide in the punishment portion of the trial. We would request that before you render a written opinion that you meet with attorney John Deninger and/or myself at your convenience, to explain any questions or concerns." *Id.* at 3.

by the undersigned as memorialized in any way, and did not appear at trial. It is clear, however, that trial counsel did not instruct Dr. Reed to consider how to develop a mitigation case for Mr. Tercero; he did not ask Dr. Reed to do a full forensic examination of Mr. Tercero, which would have had the potential to find many kinds of strong mitigating circumstances having nothing to do with future dangerousness, such as the childhood sexual abuse found in Gonzales, *supra*, or any organic brain injury or serious mental disorders. Trial counsel's dilatory use of a forensic expert like Dr. Reed, and the instructions he gave him, shows that counsel was not working with a comprehension of Texas death penalty law. Counsel showed no comprehension of the purpose of the mitigation special issue --- to prevent a death-qualified jury from being locked into what Mr. Villarreal locked his expert into: consideration only of the small subset of mitigating evidence that is relevant to future dangerousness. This lack of comprehension is borne out in the kind of evidence that Mr. Villarreal ultimately did put on (see infra).

The lack of a social history, the lack of pursuit of any relevant documentary evidence, and the cabined instructions to a late-appointed expert is a particularly poor performance for counsel in a trial involving an international defendant. The standards for adequate mitigation function in international cases should be raised,

as trial counsel should be on notice through the situation that mitigation planning has to be done early to overcome inevitable obstacles that will arise in the securing of documents from places that may be culturally strange to counsel and the investigation and securing of witnesses under similarly unusual circumstances, overshadowed by United States visa requirements and potential snafus. Indeed, Mr. Villarreal ran into such snafus with the United States Embassy as he tried to cultivate and bring family and friend witnesses at the last minute. He got in an argument with Assistant DA Hawkins on the record, on October 11, 2000, the second day of trial on the merits, when he began to complain about how easily the prosecution's witnesses were being processed for their visas in comparison to his. Hawkins, in turn, called Mr. Villarreal's preparation of his witnesses dilatory and, realizing what he had done, then announced that, however, he was not calling Mr. Villarreal ineffective:

> MR. VILLARREAL: Judge, I received word last night and I've been trying to get some breaks to go ahead and get through to the U. S. Embassy in Nicaragua regarding the witnesses that we have, our punishment witnesses. . . . The reason that it's important is because I made a trip to Nicaragua, because I had informed the Court there were mitigation witnesses that the people were trying to bring in were people living in certain remote areas within Nicaragua. I was able to locate the different witnesses, and this witness list are witnesses that we went ahead and complied [sic] with the . . . request that was given of us. . . . [T]hese nine witnesses were denied their visas to travel to the United States of America and to testify in the trial. . . . Our concern is that this Defendant will not get a fair trial . . . because of mitigation witnesses [that will not be available] by this coming Monday. . . .

MR. HAWKINS: I walked in a little late in the conversation but it's my understanding his complaint is that the U.S. Embassy or someone has denied visas to individuals . . . . I think Mr. Villarreal was handicapped but the Defendant didn't give him those names early enough in the process. And I went down [to secure State punishment witnesses] before jury selection started. Mr. Villarreal went down *last week* just before we started testimony. So I started the process as far as getting four or five witnesses in from Nicaragua much earlier than he did. . . . No law enforcement not employed by the State [e.g. Embassy personnel] has made any effort to hinder Mr. Villarreal. . . . I know we started shortly after we began jury selection . . . How long it normally takes for the visa process, I don't have any idea.

MR. VILLARREAL: Can I be heard on that point?

MR. HAWKINS: I'm not quite through. And Mr. Villarreal has been working on this for approximately --- less than six days. I think he returned on Wednesday or Thursday is when he returned back from Nicaragua, so he hasn't had nearly the time to work on it that we did. . . .

THE COURT: So you're asking for me to do something?

MR. VILLARREAL: We'll, you know, eventually be asking the Court for a continuance to allow us at least, assuming that this man gets convicted of something, for a continuance in the punishment phase . . . .

MR. DENNINGER (trial counsel): Judge, if I may just interject. I don't think there's any reason to believe that the reason that these visas were denied has anything to do with the timing and that the implication that it's somehow [] Mr. Villarreal's fault, is a mischaracterization of the problem we have here. The problem we have is visas were denied. . . .

MR. HAWKINS: I never --- someone's misunderstanding me if they're suggesting that I think Mr. Villarreal hasn't been diligent.

17 SF 213-226.

In the end, the only mitigation work apparently done in the case was trial counsel's arrangement at the last moment to personally go to Nicaragua and arrange there to bring a few family and friend witnesses to testify only about things Mr. Tercero had suggested to counsel. The trial file contains a handwritten list of witnesses to which Mr. Villarreal referred, and notes on each, with the heading: "Witnesses: (+what will say of [Defendant] according to [Defendant]." **Exhibit 8.** The witnesses on the list do not fully correspond to those who came and testified, but the themes are all the same: poverty, good character, worked hard on the farm, rejected by his father, and helped people during Hurricane Mitch.

In a hint of relevant mitigation, Mr. Tercero apparently suggested that witness Gilma Berrios would testify he "had problems with school." **Exhibit 8.** Her testimony at trial, however, was that Tercero was a "good student" in that he carried "good grades." 23 SF 169. It fit right in with all the other Nicaragua witnesses who (probably for the most part naively) falsely testified that Tercero was a good student: Gregorio Berrios Alvarez, 23 SF 119, Michael Alberto Mondragon, 23 SF 130, Lydia Tercero Hueto, 23 SF 193, and Carlos Alonzo Tercero Huerto. 23 SF 200. This illustrates the extent to which counsel failed to conduct anything like an appropriate mitigation investigation. Tercero's grade sheets, obtained recently from Nicaragua by an investigator for the undersigned,

show that he was a very poor student, his report cards reflecting, year after year, barely passing grades before he was sent the technical school route. **Exhibit 9-H** (certified grades); **Exhibit 9-G** (original grade log in which teachers record grades); **Exhibit 9-B** (Affidavit of Antonia Alvarado Puerto on her custody of the grade book as director of the Ricardo Morales Aviles grade school; Affidavit of Ann Nisenson, **Exhibit 9** (describing how grade log and certified grades were obtained by her in Nicaragua). Even though his client had suggested to him that he had problems with school, Mr. Villarreal did not undertake one of the most basic of mitigation duties: to investigate and obtain relevant documents regarding education.

The testimony of the witnesses Mr. Villarreal retrieved from Nicaragua illustrates that, not only were they put on the stand to say merely what the client had suggested they would say, with little evidence of any additional interviewing or questioning (any curiosity about undisclosed mitigating subjects whatsoever); they were put on the stand with little to no preparation by trial counsel regarding their specific testimony and even knowledge of the capital murder offense for which Mr. Tercero had been convicted or the crimes attributed to him in Nicaragua. As a consequence, as illustrated in the summaries of their testimonies above, their credibility was clobbered by the State on cross-examination. Their

testimony was confined to good character and performance subjects (good to grandparents, good at school, good at saving people from mudslides). Except for themes of poverty and parental abandonment, they said nothing that could help the jury understand the peculiar characteristics of Mr. Tercero that may have led him to behave in a less than normally regulated way.  So, they got clobbered. If they thought Mr. Tercero was "good," why did he kill Mr. Berger, kidnap a child while shooting the father, rob a watermelon salesman at gunpoint? If being "good" were his only defense, what would keep the jury from finding against him on the basis of his contrary behavior?

The jury was left with no explanation of the peculiar vulnerabilities of the defendant and was given all the more reason to believe --- on the basis of the false testimony about his school experience --- that he was a very capable individual, adept at planning complicated heists and pulling together teams to carry them off successfully.  The jury was left without explanation simply because trial counsel abandoned their very simple duty to look for it.

Additionally, merely bringing in, at the last moment, some unprepared witnesses suggested by the defendant and calling that "mitigation" falls way below constitutionally adequate performance according to all standards that existed in 2000.

3. **Trial counsel's deficient performance caused dramatic prejudice to Mr. Tercero's case.**

Had counsel performed competently, they would have been able to flip the Gestalt of the trial. All of the State's evidence pointing to Mr. Tercero as a leader, plotter, manipulator, instigator, premeditator, schemer, calculator, etc., could have been called into question by the evidence that could have been secured about Tercero's school records, pesticide exposure, and history of family mental illness, including his father. Coupled with the findings of a forensic neuropsychologist that Mr. Tercero suffered, as a result of his genetic inheritance and life experiences, from post-traumatic stress, high anxiety, depression, and evidence of psychosis, and fell within the 1st percentile of executive brain function, the jury would have had a vastly different way of perceiving the crimes he had committed as much more impulsive and less calculated, and, as a consequence should have assigned him less culpability (due to things in his life history and in himself beyond his responsible control).

Recent affidavits by witnesses in Nicaragua contribute to an understanding of what timely, professionally adequate mitigation investigation of Mr. Tercero's background would have looked like. It would have presented, inter alia, the following issues not brought up in Mr. Tercero's trial:

**a. Prolonged exposure to pesticides as a child.**

The recent declarations re-frame Tercero's work for his grandparents and others in the fields as child labor. They highlight that, when Mr. Tercero was working in the fields he was exposed to aerial spraying of pesticides, that caused him to be sick with headaches "three or four days a week." Declaration of Pedro Pablo Canales, **Exhibit 10**-C. The water in Mr. Tercero's town, Posoltega, was contaminated by the pesticide use. *Id*. The pesticide Lorsban could be smelled in the air. *Id*. DDT, Gramoxone and Nemagon were used near Tercero's house. Declaration of Jose Tercero Huete, **Exhibit 10**-**B**. As one declarant, Tercero's uncle, states:

> The whole world knew they were dangerous and caused health problems. Babies were born with physical deformities. Now the government prohibits children from working in the fields and having contact with these dangerous chemical substances.

Declaration of Jose Tercero Huete, **Exhibit 10**-**B**. Mr. Tercero's grandmother who raised him states:

> By the time Bernardo was 10 years old, he was working in the field with me, cutting coffee, sugar cane and cotton. Every two to three days, planes would fumigate the fields while we were working. We did not have gloves or masks and the chemicals would get on our skin. Often, we became sick and vomited afterwards. Then we had to rest for 30 minutes to an hour before going to work.

Declaration of Luisa Amanda Heute, **Exhibit 10**-**A**. Tercero's childhood headaches led his grandmother (caregiver) to have him seen by a psychologist:

85

Bernardo had bad headaches, three or four times a week, beginning when he was around 12 or 13 years old. When he had a headache, Bernardo did not feel like working or going to school. The headaches were so strong that he usually cried and was depressed because he was unable to function. We sent him to Chinandega for a psychological evaluation on the recommendation of the doctor at the local clinic in Posoltega. We did not have sufficient health centers nearby for thse mental health needs.

Declaration of Luisa Amanda Huete, **Exhibit 10**-**A**.

### b. Deep family mental health history.

The persons that have been deposed in Nicaragua generally do not show a sophisticated understanding of mental health issues, but identified members of Mr. Tercero's family that had relevant mental health problems and described to some extent what they were. These identifications and descriptions form a basis for further investigation of documentary support for diagnoses and treatment in Nicaraguan mental health facilities, and certainly would have been very important information (diagnoses or not) for Mr. Tercero's jury to consider. They would have been something a competent mental health professional could have relied upon in an examination of Mr. Tercero for mitigation purposes.

Mr. Tercero's grandmother stated that one of her own fourteen children had "many mental health problems." Affidavit of Luisa Amanda Huetes Torrez, **Exhibit 9**-**A**. She noted that Carlos Huete, that son, had died recently. "In the news it appears as if it were a car accident but I do not know what happened. He

was always sick in the mind." *Id.* Pedro Pablo Canales Quezada described

Bernardo's uncles problems in a some detail:

> His uncle Carlos was a maternal uncle who always had mental problems. In middle school, he used to come to the school as if he were an administrator or principle [sic] but he was not nor did he even work at the school. He would arrive and say things that made no sense. His family used to come and get him and take him home. In 1997, I remember Carlos Alfonso was very sick. I remember he was still sick when I left Posoltega for a few years. Afterwards, my family told me he had improved with some medication and that he had become involved with the Sandinistas and won the election to be mayor.

Affidavit of Pedro Pablo Canales Quezada, **Exhibit** 9-C at 3. Mr. Tercero's

paternal uncle, Rodolfo Agustin Membreno Centeno, stated:

> We have a family with a long history of mental health problems. My father and my mother [Mr. Tercero's paternal grandfather and grandmother] were institutionalized there at Kilometro 5, in the National Psychiatric Hospital in Managua. My mother died without ever recovering her mental [] health.
>
> My father managed 2 large farms. The stress made him crazy. Sometimes the stress gave him cholera and made him hyperactive. He became angry with people very easily. We had to look after him frequently because he would speak without making sense and act childlike.
>
> Before he was admitted to Kilometro 5, one day he left the house at four in the morning and went to another farm to grab a horse. He was lost on the hill for 15 days. We did not know anything of him. They had to go and get him from the hill. They brought him back by force. After they took him to Kilometro 5.

This was not the only time that my father behaved insane. Also another time a bank matter became complicated with one of my brothers. My father came and behaved insane. He acted like a child, like a young child's mind. He said incoherent things.

Our mother also was admitted to Kilometro 5. The two were admitted before Mitch. We inherited from them our psychiatric problems. For example, I have suffered many mental health problems. It started when I was around 25 years old. I heard voices and saw hallucinations. Once, entering the house, I felt pressure and heard a voice saying to return to the mountain. I left the house like my father and spent days walking in the mountain without eating. I drank very little water and heard voices telling me to continue walking.

Things happened to me that have made me feel the pain of suffering. I went three times to Kilometro 5. I do not remember when I went each time. I received electric shock three times.

One time Desiderio and I were walking in the highway and I heard Maria, Jesus Christ's mother, speaking to me. I saw her in the sky and told Desiderio but I saw things that were not there. Desiderio wanted to take me to the psychiatrist but I would not let him. I felt bad but I was afraid of hospitals. In the end, Desiderio drove me to Kilometro 5 in Managua. They gave me pills. I also received electric shock to cure the brain . . . . I continue to take pills for my mental health. I take Deazepan, Cerebrofos, and Lozartan. I do not have money to go and see a doctor. I only go to the pharmacy and ask for the medication I need.

Affidavit of Rodolfo Agustin Membreno Centeno, **Exhibit 9-F**. Mr. Centeno add about Mr. Tercero's father, his brother, that he "died in 2011. He shut himself in with a candle and burned himself. They found him burned all over his body. His wife was not there. She lost everything in the fire." *Id*.

### c. Very poor academic performance.

The consensus from Mr. Tercero's obviously unprepared witnesses at trial was that he was a "good student," and several explained their affirmations of his academic prowess by saying he made good grades or helped other students who, unlike him, were struggling. This was (essentially unintentional) false testimony, within the meaning of *Ex parte Chavez*, 371 S.W.3d 200, 207-08 (Tex. Crim. App. 2012), elicited from counsel because counsel had not bothered to do *any* documentary investigation in Nicaragua. Grades, if there are such, for the technical school to which Mr. Tercero was directed after eighth grade have not been secured, but Mr. Tercero's elementary and middle school grades are remarkably poor, almost solid "60"s even in "Conduct" in elementary school. Declaration of Ann Nisenson, **Exhibit 9** (Graph of Grades); **Exhibit** 9-**G** (photos of grade log books); **Exhibit** 9-**H** (Certified Grades). The Director of the elementary school, Escuela Ricardo Morales Aviles, has provided an affidavit verifying that the grade reports observed and photographed in their original log books (**Exhibit 9-G**) by Ms. Nisenson, mitigation specialist for the undersigned, have been kept under secure conditions. Affidavit of Antonia Alvarado Puerto, **Exhibit 9-B**. Mr. Tercero's third grade teacher confirmed that Mr. Tercero was not a good student. He was in her first class as a teacher, 28 years ago. Modesta Haydee Zamora Mendoza attested that Bernardo was between 8 and 10 years old when he was in 3rd grade. Having

older students enrolled was not unusual for the time, but Bernardo stood out as not being as quick to learn material as the other older students. Mr. Tercero's low early childhood exposure to pesticides, his family mental health history, and particularly his scholastic marks coupled with his impending execution date led the undersigned to have him evaluated by a forensic neuropsychologist to look for intellectual disability, out of concern that he might be ineligible for the death penalty (and no counsel from pre-trial until the present had looked into that question). The results of the testing on August 3rd and 4th by Dr. Antolin Llorente, a Cuban-born neuropsychologist who used culturally appropriate testing with Mr. Tercero indeed revealed that he has a full-scale IQ in the 81 to 82 range, barely outside the range that would, coupled with adaptive deficits, automatically protect him from execution.

### 4. Neuropsychological testing has uncovered severe deficiencies directly relevant to mental status during the offense.

The undersigned was brought into this case about a month ago as a consultant. Having been apprised of the findings made by the investigator in Nicaragua in May 2015 of family mental illness, pesticide exposure (although not recorded in affidavits at that time), and poor academic performance, the

undersigned agreed with others that neuropsychological testing should be done to rule out Intellectual Disability (I.D.) in Mr. Tercero.

Finding a neuropsychologist both professionally qualified and Spanish speaking, in order to appropriately culturally test Mr. Tercero, was somewhat difficult. Dr. Antolin Llorente was located and the first available date for him to see Mr. Tercero was August 3rd and 4th, 2015, on which he indeed met with Mr. Tercero and conducted a battery of tests. He has just now finished his report, attached as **Exhibit 11** (with CV).

Dr. Llorente has found Mr. Tercero to have a general I.Q. of around 83, just outside of range for a possible diagnosis of Intellectual Disability. **Exhibit 11** at 13. That fact alone makes it reasonably probable that one juror might have "struck a different balance" as to the weight of the evidence regarding Mr. Tercero's intent in the crime or level of culpability for intent. *Wiggins*, 539 U.S. at 537. However, Dr. Llorente also found: (1) Mr. Tercero's reading comprehension is between the 2nd and 3rd grade levels (*id*. at 12): (2) his visual attention, concentration, and working memory are impaired (in the less than one percent range) (*id*. at 14); psychomotor speed and executive skills in impaired (< 1 percent) range (*id*.); fine motor coordination and dexterity in impaired (< 1 percent) range (*id*. at 15); among

other impairments. He "exhibited severe planning and organizational difficulties." *Id*. at 14.

These dramatic results show, essentially, that Mr. Tercero has almost no ability to "put on the brakes." This Court should note the varying perspectives of the eye witnesses to the Berger shooting; how they all testify to some conflict between Mr. Tercero and Mr. Berger, however long or brief. If indeed Mr. Tercero aggressed against Mr. Berger in the way the State has insisted, the findings of Mr. Llorente certainly make him less culpable for the offense, and that lesser degree of culpability should have been considered by the jurors once they already had found future dangerousness and at least one of them should have been persuaded to remove the death penalty as a sentencing option.

Mr. Tercero may have been a "mover and shaker," but he is not the calculating planner the State made him out to be. He is nowhere close to having the capacity to be an effective leader and, very likely, was a follower in the scenarios about which the jury had to make findings (guilt/innocence and punishment facts). His own trial testimony about collaborating, rather than leading others, into the offense is more credible in light of the forensic testing. This raises a question that was virtually ignored during the trial: What role did the silent co-defendant Jorge Gonzales have? Gonzales entered the store first. Could Tercero have been

Gonzales' patsy, moving to the front of the store, rendering himself vulnerable (to what happened or to something else untoward that could have happened) in the company of a more savvy co-conspirator?

Dr. Llorente also found that Mr. Tercero is presently not competent to be executed. A motion under 46.05 is being filed in the trial court more or less simultaneously with the instant suggestion for reconsideration, while it is understood that there can be no appeal to this Court on that matter. It must be noted, for the purposes of the IAC claim here, that the kind of mental illness that Dr. Llorente has found in Mr. Tercero is profound, and also may have been present and had some effect in the tragic and regrettable shooting of Mr. Berger.

Given the products of recent investigation, which  h all were available at the time of trial, at least one juror likely would have been convinced to return a verdict less than death. Trial counsel's deficient performance has prejudiced Mr. Tercero and the performances of subsequent counsel have prevented him from rectifying the situation.

## CONCLUSION AND PRAYER

Mr. Tercero's case is hauntingly reminiscent of a very old case decided by this Court. Mr. Tercero would hope for a better result in his case. In *Ex parte Leon Martinez, Jr.*, this Court examined a remarkable trial in Pecos County, in which a young man who was a citizen of Mexico was charged with killing a white woman in a remote spot. A controversy over the defendant's age --- was he sixteen and ineligible for the death penalty? --- was not resolved, despite desperate efforts by his relatives, before he was tried and sentenced to die. There were considerable irregularities in the trial that affected Martinez' right to counsel. None the least, counsel were thwarted by a group of respectable citizens who threatened them if they were to turn in a notice of appeal. They did not. And so, this Court struggled to find jurisdiction. The Presiding Judge of this Court issued a long dissent when the case was dismissed, essentially asserting that where there was a miscarriage of justice, there should be no alternative but to find jurisdiction. *Ex parte Leon Martinez, Jr.*, 145 S.W. 959 (Tex. Crim. App. 1912).

There is no question, of course, that Mr. Tercero killed Mr. Berger. The critical query is, What was Mr. Tercero's mental status (as it impacted culpability and/or mitigation)? The real mitigation investigation that has been done in short

order has made that a very serious question that should be grounds for this Court to find jurisdiction.

WHEREUPON, PREMISES CONSIDERED, Mr. Tercero prays that this Court might grant his suggestion for reconsideration of his second state habeas application, upon finding his first inadequate, not constituting a proper application at least insofar as state habeas counsel ignored his duty to expeditiously investigate facts outside the record that might form the basis for a court to find ineffective assistance of trial counsel. Mr. Tercero also prays that this Court stay his execution.

Respectfully submitted,

/s/ Walter C. Long_____
WALTER C. LONG

Walter C. Long
Texas Bar No. 24002491
P.O. Box 41557
Austin, Texas 78704
512-912-0722 (office)
512-554-2269 (cell)
waltlong@aol.com

## CERTIFICATE OF SERVICE

I, Walter C. Long, do hereby certify that at true and correct copy of the foregoing document has been served by me on this the 18th day of August, 2015, by e-mail delivery on Assistant District Attorney Josh Reiss, Harris County District Attorney's Office, 1201 Franklin Street #600, Houston, Texas 77002, at reiss_josh@dao.hctx.net .

/s/ Walter C. Long_____
Walter C. Long